Annick M. Persinger (CA Bar No. 272996)
**TYCKO & ZAVAREEI LLP**
10880 Wilshire Blvd. Suite 1101
Los Angeles, CA 90024
(510) 254-6808
*apersinger@tzlegal.com*

*Counsel for Plaintiffs and Class*

[Additional Counsel listed on Signature Page]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| FRANKLIN MCINTYRE, MELISSA NULL, CHRISTINA REGNIER, CRYSTAL SMITH, PAULA NIENHUESER, RYAN COLLINS, KEVIN GROSS, NANCY BOCEK, JOCELYN BLAND, MARK KROIK, ABHINAV ARUN KUMAR, AND LORI PERRINS, *on behalf of themselves and all others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>AMERICAN HONDA MOTOR CO., INC., a California corporation,<br><br>Defendant. | Case No.: 2:23-cv-7024-SPG-BFM<br><br>Hon. Sherilyn Peace Garnett<br><br>**<u>CLASS ACTION</u>**<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

SECOND AMENDED CLASS ACTION COMPLAINT

All allegations made in this Complaint are based upon information and belief except those allegations that pertain to Plaintiffs, which are based on personal knowledge. Each allegation in this Complaint either has evidentiary support or, alternatively, pursuant to Rule 11(b)(3) of the *Federal Rules of Civil Procedure*, is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

## I.    NATURE OF THIS ACTION

1.    Plaintiffs bring this proposed class action for damages on behalf of themselves and all other persons and entities nationwide who purchased a 2019-2023 Acura RDX vehicle (the "Vehicles" or "Class Vehicles") manufactured by defendant American Honda Motor Co., Inc. ("Honda" or "Defendant").

2.    The Vehicles are equipped with a defective rear hatch window with electrical defroster that causes the rear windshield glass to spontaneously shatter or break with no external impact (the "Defect"). *See* images[1] below:



---

[1] These images are screenshots taken from a video of the no-impact shattering happening in real time. Available at https://www.youtube.com/watch?v=xnZeeBkruPY.



3.      According to Defendant, the spontaneous shattering of the Vehicle's rear hatch window is caused by an "incorrect specification for the rear defroster grid."[2]

4.      Automobile windows (including rear windshields) play a vital role in the Vehicles' occupant protection system by helping protect occupants from full- and partial-ejection during normal vehicle operation as well as crashes. Windows also serve as an important barrier separating occupants from weather elements, dust, debris, and other outside objects that could otherwise intrude into the passenger compartment and jeopardize the operator's ability to control the Vehicle. Windows also prevent small children and pets from exiting the Vehicles when the Vehicles are in motion, and secure occupants and occupants' personal property from intruders, thieves, and other ill-intentioned persons.

5.      These rear hatch window failures occur without warning, when the motor is off or running, and when the Vehicles are still or travelling at speed.

6.      If a rear hatch window fails when the Vehicle is travelling at speed, the resulting noise can startle the driver and cause him or her to panic and swerve dangerously. Vehicle owners who have experienced rear hatch window failure while driving may confuse the loud crashing noise with the impact of another vehicle or with gun fire.

---

[2]  *Acura    Service    Bulletin    22-014*    (October    28,    2022),    *available    at* https://www.tsbsearch.com/Acura/22-014 and attached hereto as Exhibit A.

7.      As documented by widespread consumer complaints, this Defect has plagued the current generation of RDX Vehicles since its launch.

8.      Based upon an anonymous communication recently received by Plaintiffs' counsel from an individual who claims to have worked at the East Liberty, Ohio assembly plant where the Vehicles were and are produced, Defendant has known about the propensity of these rear hatch windows to spontaneously shatter since at least as early as the launch of these Vehicles in June 2018.

9.      This anonymous communication reads as follows:

I am writing this email because I have become aware that you are one among a team of attorneys in litigation against Honda concerning the unexpected exploding of the rear hatch glass in the 3rd gen Acura RDX vehicles and I would like to help if I can. I have no doubt that you will be successful in your case against them. I say that because of what *I have witnessed personally while working at the Honda East Liberty assembly plant where the RDX is produced*.

This issue has been around since the launch of this model but very sporadic. ***This issue has definitely been known by Honda and there will be records to prove it.*** I can't provide those, I can just share some memories of events that I remember I witnessed. Maybe with my provided insights you can.

This 3rd gen RDX hatch is a composite material hatch that is a supplier part. The other models produced at ELP are steel and have the glass installed in house and have never had this issue. The first time I heard about this issue was when there were a couple of units with broken rear glass sitting inside. One had a story about a Vehicle Quality driver being on the test track and the glass just spontaneously exploded. The other was a return from the shipping lot of American Honda that the glass had just seemingly broken by itself. I was skeptical of both explanations believing them to be acts of vandalism, but I quickly changed my mind when a rear glass exploded while a unit was idling past inside the plant. This issue got real in a hurry. The APQ department was the one who had to deal with the issue at first because as I have mentioned this hatch is a supplier part and they are our parts quality. They were tasked with testing the rear glass. ***The chosen method was to walk around and every RDX on the property was struck in the rear glass with a rubber mallet to see if it would break.*** As laughable as it seems, that was the test because it was not known at that time the real cause. APQ will be the department that was charged with replacing the no good hatches and the interior pieces that were showered in broken glass. ***There will certainly be purchase records showing to what extent Honda was aware. This was such a problem that at one point roughly 70 units were lined up outside waiting to have the rear hatches replaced and all of the affected interior pieces replaced.***

***It was such a huge problem that Honda changed safety protocol and started requiring the assembly associates to wear extra PPE, face shield or goggles, while installing because of potential safety hazard they were now being exposed to***. This safety precaution

also extended to the associates, assembly and weld department associates, at the end of the line who had to adjust the fitment of the T/G for fit and finish.

At some point it was decided to put shipping wrap on the inside of the RDX rear glass to prevent the interior from getting damaged by all the glass shrapnel. This change resulted in the associates inspecting the rear washer function while seated in the driver's seat to be unable to see its function, so those units were being written up on their FIC, Final Inspection Card, for rechecks.

RDX FICs during that spike at the factory will show which units had experienced this problem. APQ records will show the extent of the financial loss that Honda was aware that just RDX in their possession were incurring because of this issue. VQD reports will show that these units were put on stop ship and will show cases they experienced.

(emphasis added).[3]

10.     Further, at least as early as 2020, Defendant received reports from consumers, the National Highway Traffic Safety Administration ("NHTSA"), and its own dealerships that the Vehicles' rear hatch windows were spontaneously shattering under normal operating conditions.

11.     Yet, despite the fact that Defendant considered the exploding rear hatch windows to be a safety issue requiring its employees to wear protective gear during the manufacturing process of these Vehicles, Defendant failed to disclose and actively concealed the Defect from the public, and continues to manufacture, distribute, and sell the Vehicles without disclosing the Defect.

12.     The existence of this Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase a Vehicle. And, the existence of this Defect is a serious safety issue.

13.     Had Plaintiffs and the putative class members known of the Defect, they would have paid less for the Vehicles or would not have purchased them.

14.     Reasonable consumers, like Plaintiffs, expect that a vehicle's rear hatch window will be safe, will function in a manner that will not pose a safety risk, and is free from defects. Reasonable consumers certainly do not expect rear hatch windows to spontaneously explode.

---

[3] A true and accurate copy of the anonymous communication received by Plaintiffs' Counsel is attached as Exhibit B.

15. Plaintiffs and the putative class members further reasonably expect that Defendant will not sell vehicles with known safety defects, such as the defective rear hatch window, and will disclose any such defects to its consumers when it learns of them.

16. Plaintiffs bring this action for breach of implied warranty on behalf of a nationwide class of Vehicle purchasers. Plaintiffs also seek to represent state specific subclasses for the states of Alabama, California, Illinois, Kansas, Maryland, Michigan, New Jersey, Pennsylvania, Oregon, Texas, and Washington for violations of each state's consumer protection statutes and for breaching each state's implied warranty laws. Plaintiffs seek damages on behalf of themselves and all others similarly situated.

## II.    JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2), as amended by the Class Action Fairness Act of 2005, because the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and because this is a class action in which the members of the classes and Defendant are citizens of different states.

18. Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendant is a resident of Torrance, California, which is located in this district.

## III.    PARTIES

**A.    Franklin McIntyre (Alabama)**

19. Plaintiff Franklin McIntyre is an Alabama citizen residing in Jackson, Alabama

20. Plaintiff McIntyre purchased a new 2023 Acura RDX on November 30, 2022 from Joe Bullard Acura in Mobile, Alabama. Prior to purchasing the Vehicle, Plaintiff McIntyre was considering competing vehicles from Toyota, Mazda, Ford, and Dodge.

21. Plaintiff McIntyre researched the Vehicle online — including Acura.com, and other internet sources — before deciding to purchase the Vehicle. None of the websites contained any disclosure from Defendant relating to the Defect.

22. Safety and reliability are very important features for Plaintiff McIntyre and Plaintiff McIntyre considers the Defect to be a safety concern, because it can cause the rear hatch window to shatter when the Vehicle is in motion, thereby distracting the driver.

23. Plaintiff McIntyre discussed the Vehicle's features with the authorized dealer's salesperson and reviewed the Vehicle's Monroney sticker prior to deciding to purchase the Vehicle. The Monroney sticker on the Vehicle did not contain any disclosure from Defendant relating to the Defect.

24. None of the representations received by Plaintiff McIntyre contained any disclosure regarding any Defect related to the Vehicle's rear hatch window. Nor did they disclose that the Vehicle's rear hatch window was prone to spontaneous shattering. Had Defendant disclosed the Defect, Plaintiff McIntyre would not have purchased the Vehicle, or would have paid less for the Vehicle.

25. On May 4, 2023, Plaintiff McIntyre's wife drove the Vehicle to work and parked it in her employer's parking lot. But when she returned to the Vehicle she noticed that the rear hatch window had shattered. There was no evidence of external impact. Rather, all evidence suggested it simply shattered because of the Defect.

26. Shortly thereafter, Plaintiff McIntyre called his authorized dealer, Joe Bullard Acura. The dealer told him that the damage to the rear hatch window was not covered under the warranty. At the time of Plaintiff McIntyre's call to the dealer, the Vehicle had under 12,000 miles on the odometer.

27. Accordingly, Plaintiff McIntyre was forced to take his Vehicle to Paul's Discount Glass & Tire, Inc. and pay $588.50 out-of-pocket to replace the rear hatch window.

28. Prior to purchasing the Vehicle, none of the representations received by Plaintiff McIntyre contained any disclosure relating to any defect in the rear hatch window. Had Defendant disclosed that the rear hatch window in the Vehicle was defective, posing a safety risk, Plaintiff McIntyre would not have purchased it, or would have paid less for the Vehicle.

29.     Plaintiff McIntyre has suffered an ascertainable loss as a result of Defendant's wrongful conduct associated with the Defect including, but not limited to, out-of-pocket costs to replace the rear hatch window and the diminished value of the Vehicle.

**B.     Christina Regnier (California)**

30.     Plaintiff Christina Regnier is a California citizen residing in Los Angeles County, California.

31.     Plaintiff Regnier purchased a new 2020 Acura RDX on November 28, 2019 from Cerritos Acura in Cerritos, California.

32.     Prior to purchasing the Vehicle, Plaintiff Regnier was considering competing vehicles from Honda, Toyota, and Mazda.

33.     Plaintiff Regnier researched the Vehicle online — including Acura.com, before deciding to purchase the Vehicle. Acura.com did not contain any disclosure from Defendant relating to the Defect.

34.     Safety and reliability are very important features for Plaintiff Regnier, and Plaintiff Regnier considers the Defect to be a safety concern, because it can cause the rear hatch window to shatter when the Vehicle is in motion, thereby distracting the driver.

35.     Plaintiff Regnier discussed the Vehicle's features with the authorized dealer's salesperson and reviewed the Vehicle's Monroney sticker prior to deciding to purchase the Vehicle. The Monroney sticker on the Vehicle did not contain any disclosure from Defendant relating to the Defect.

36.     None of the representations received by Plaintiff Regnier contained any disclosure regarding any Defect relating to the Vehicle's rear hatch window. Nor did they disclose that the Vehicle's rear hatch window was prone to spontaneous shattering. Had Defendant disclosed the Defect, Plaintiff Regnier would not have purchased the Vehicle, or would have paid less for the Vehicle.

37.    On or about April 10, 2023, Plaintiff Regnier was driving her Vehicle at highway speeds when her rear hatch window spontaneously shattered. At the time of failure, Plaintiff Regnier was speaking to a friend on her mobile phone and both described the resulting noise as an "explosion." There was no evidence of external impact. Rather, all evidence suggested it simply shattered because of the Defect.

38.    Plaintiff Regnier called Cerritos Acura the next day (April 11. 2023), who directed her to contact Acura customer care. When Plaintiff Regnier subsequently called Acura customer care on or around April 11, 2023, she was told that there was no known rear hatch window defect with Acura RDX Vehicles and that there was no recall for the Vehicles related to window shattering. Acura customer care refused to cover the cost to replace the shattered rear hatch window. Plaintiff Regnier paid $700 to replace the defective rear hatch window. Plaintiff Regnier also paid $110 to remove the glass shards that had fallen inside the rear hatch.

39.    Prior to purchasing the Vehicle, none of the representations received by Plaintiff Regnier contained any disclosure relating to any defect in the rear hatch window. Had Defendant disclosed that the rear hatch window in the Vehicle was defective, posing a safety risk, Plaintiff Regnier would not have purchased it, or would have paid less for the Vehicle.

40.    Plaintiff Regnier has suffered an ascertainable loss as a result of Defendant's wrongful conduct associated with the Defect including, but not limited to, out-of-pocket costs to replace the rear hatch window and the diminished value of the Vehicle.

C.    **Nancy Bocek (Illinois)**

41.    Plaintiff Nancy Bocek is an Illinois citizen residing in Villa Park, Illinois.

42.    Plaintiff Bocek purchased a certified pre-owned 2020 Acura RDX in June 2020 from McGrath Acura of Morton Grove.

43.    Prior to purchasing the Vehicle, Plaintiff Bocek was considering competing vehicles from BMW, Lexus, and Mazda.

44.     Plaintiff Bocek researched the Vehicle online — including Acura.com, cars.usnews.com, jdpower.com, and cars.com — before deciding to purchase the Vehicle. None of the websites contained any disclosure from Defendant relating to the Defect.

45.     Safety and reliability are very important features for Plaintiff Bocek and Plaintiff Bocek considers the Defect to be a safety concern, because it can cause the rear hatch window to shatter when the Vehicle is in motion, thereby distracting the driver.

46.     Plaintiff Bocek discussed the Vehicle's features with the authorized dealer's salesperson and reviewed the Vehicle's Monroney sticker prior to deciding to purchase the Vehicle. The Monroney sticker on the Vehicle did not contain any disclosure from Defendant relating to the Defect.

47.     None of the representations received by Plaintiff Bocek contained any disclosure regarding any Defect related to the Vehicle's rear hatch window. Nor did they disclose that the Vehicle's rear hatch window was prone to spontaneous shattering. Had Defendant disclosed the Defect, Plaintiff Bocek would not have purchased the Vehicle, or would have paid less for the Vehicle.

48.     In October 2021, Plaintiff Bocek parked her car in front of her home. After she got out of the car and started walking toward her front door, she heard the car's rear hatch window shatter. There was no evidence of external impact. Rather, all evidence suggested the rear hatch window simply shattered because of the Defect.

49.     Shortly thereafter, Plaintiff Bocek took her car to McGrath Acura of Morton Grove in Morton Grove, Illinois. At the time of Plaintiff McIntyre's visit to the dealer, the Vehicle had approximately 12,000 miles on the odometer. Despite still being under warranty, the Acura dealer represented to Plaintiff Bocek that her valid warranty does not cover the rear hatch window.

50.     Accordingly, Plaintiff Bocek paid $457.84 to McGrath Acura of Morton Grove to replace her rear hatch window.

51.     Prior to purchasing the Vehicle, none of the representations received by Plaintiff Bocek contained any disclosure relating to any defect in the rear hatch window. Had Defendant disclosed that

the rear hatch window in the Vehicle was defective, posing a safety risk, Plaintiff Bocek would not have purchased it, or would have paid less for the Vehicle.

52.    Plaintiff Bocek has suffered an ascertainable loss as a result of Defendant's wrongful conduct associated with the rear hatch window defect including, but not limited to, out-of-pocket costs to replace the rear windshield and the diminished value of the Vehicle.

**D.    Paula Nienhueser (Kansas)**

53.    Plaintiff Paula Nienhueser is a Missouri citizen residing in Camden County, Missouri.

54.    Plaintiff Nienhueser purchased a certified pre-owned low mileage 2019 Acura RDX on or around April 9, 2019 from Hendricks Acura in Overland Park, Kansas.

55.    Prior to purchasing the Vehicle, Plaintiff Nienhueser was considering competing vehicles from GMC, Audi, Cadillac, and Volvo.

56.    Plaintiff Nienhueser researched the Vehicle online — including Acura.com, and other internet sources — before deciding to purchase the Vehicle. None of the websites contained any disclosure from Defendant relating to the Defect.

57.    Safety and reliability are very important features for Plaintiff Nienhueser and Plaintiff Nienhueser considers the Defect to be a safety concern, because it can cause the rear hatch window to shatter when the Vehicle is in motion, thereby distracting the driver.

58.    Plaintiff Nienhueser discussed the Vehicle's features with the authorized dealer's salesperson and reviewed the Vehicle's certified pre-owned statement prior to deciding to purchase the Vehicle. Acura's certified pre-owned statement did not contain any disclosure from Defendant relating to the Defect.

59.    None of the representations received by Plaintiff Nienhueser contained any disclosure regarding any Defect related to the Vehicle's rear hatch window. Nor did they disclose that the Vehicle's rear hatch window was prone to spontaneously shattering. Had Defendant disclosed the Defect, Plaintiff Nienhueser would not have purchased the Vehicle, or would have paid less for the Vehicle.

60.    On or about January 11, 2023, Plaintiff Nienhueser opened the driver side door in order to drive home from work. As she shut the door, she heard a loud sound from the rear of her Vehicle. Plaintiff Nienhueser looked toward the back of her Vehicle and saw that the rear hatch window had shattered and there was now a large hole in the window. The glass fell into the rear interior of the Vehicle. There was no evidence of external impact. Rather, all evidence suggested the rear hatch window simply shattered because of the Defect.

61.    On the same day that the rear hatch window spontaneously shattered, Plaintiff called Springfield Acura to set up an appointment to replace the window. Plaintiff Nienhueser requested that the replacement be done at no cost to her because of the Defect. The service representative told Plaintiff that he has seen quite a few of these shattered rear hatch windows and that Acura would not cover the cost of replacement as her Vehicle's warranty had expired. Plaintiff paid $627 for the replacement window installation. Despite paying $627 for the repair, glass shards remain inside the rear hatch door and still can be heard moving around when Plaintiff opens and closes the rear hatch.

62.    Prior to purchasing the Vehicle, none of the representations received by Plaintiff Nienhueser contained any disclosure relating to any defect in the rear hatch window. Had Defendant disclosed that the rear hatch window in the Vehicle was defective, posing a safety risk, Plaintiff Nienhueser would not have purchased it, or would have paid less for the Vehicle.

63.    Plaintiff Nienhueser has suffered an ascertainable loss as a result of Defendant's wrongful conduct associated with the Defect including, but not limited to, out-of-pocket costs to replace the rear hatch window and the diminished value of the Vehicle.

**E.    Crystal Smith and Kevin Gross (Maryland)**

64.    Plaintiff Crystal Smith is a Maryland citizen residing in Nottingham, Maryland.

65.    Plaintiff Smith purchased a 2019 Acura RDX in January 2020 from Acura of Ellicott City in Maryland.

66.    Prior to purchasing the Vehicle, Plaintiff Smith was considering competing vehicles from Nissan, Ford, Lexus, and BMW.

67. Plaintiff Smith researched the Vehicle online — including Acura.com, and other internet sources — before deciding to purchase the Vehicle. None of the websites contained any disclosure from Defendant relating to the Defect.

68. Safety and reliability are very important features for Plaintiff Smith and Plaintiff Smith considers the Defect to be a safety concern, because it can cause the rear hatch window to shatter when the Vehicle is in motion, thereby distracting the driver.

69. Plaintiff Smith discussed the Vehicle's features with the authorized dealer's salesperson and reviewed the Vehicle's Monroney sticker prior to deciding to purchase the Vehicle. The Monroney sticker on the Vehicle did not contain any disclosure from Defendant relating to the Defect.

70. None of the representations received by Plaintiff Smith contained any disclosure regarding any Defect related to the Vehicle's rear hatch window. Nor did they disclose that the Vehicle's rear hatch window was prone to spontaneous shattering. Had Defendant disclosed the Defect, Plaintiff Smith would not have purchased the Vehicle, or would have paid less for the Vehicle.

71. On the morning of February 11, 2023, Plaintiff Smith came outside to find that the rear hatch window of her Vehicle had shattered. There was no evidence of external impact. Rather, all evidence suggested it simply shattered because of the Defect. Ms. Smith's Vehicle had been driven about 22,000 miles when the rear hatch window spontaneously shattered on February 11, 2023.

72. On the same day (February 11, 2023), Plaintiff Smith contacted AutoNation Acura Hunt Valley in Cockeysville, Maryland to seek warranty coverage for the shattered rear hatch window. Plaintiff Smith's Vehicle was well within the mileage and 7-year time limits of the extended warranty she purchased from Acura when she originally bought the Vehicle. The representative for AutoNation Acura Hunt Valley told Ms. Smith that the warranty did not cover this problem and that she would have to pay for any repairs on her own or through her insurance.

73. So, on February 11, 2023, Plaintiff Smith paid a $150 deductible to replace the rear windshield.

74. After the rear hatch window was replaced, Plaintiff Smith started experiencing a tailgate lift alert and contacted AutoNation Acura Hunt Valley in Cockeysville, Maryland also on February

11, 2023. The dealer told her it was going to cost her $360 for two hours of labor to repair the Vehicle. However, the dealer ultimately determined that the tailgate was fine but there was glass pieces caught in the rear hatch and suggested she take the Vehicle to a body shop to remove the glass pieces.

75.     The dealer told Ms. Smith there is no recall so she would have to open another claim with her insurance company. Plaintiff Smith has not opened a second claim with her insurer because she does not believe she should have to pay the deductible since it was not her fault that the rear hatch window shattered.

76.     On the morning of January 11, 2024, approximately eleven months after the rear hatch window first shattered, Plaintiff Smith came outside to find that the rear hatch window of her Vehicle had shattered again. There was no evidence of external impact. Rather, all evidence suggested it simply shattered because of the Defect.

77.     Ms. Smith immediately called AutoNation Acura Hunt Valley and explained that her rear hatch window spontaneously shattered for a second time. The representative for AutoNation Acura Hunt Valley told Ms. Smith that replacement windows for the rear hatch for these Vehicles were on backorder. She also told Ms. Smith that she would make a request to Acura for a good-will customer accommodation since this was the second time the window shattered. About ten days later, Acura ultimately agreed to install at no charge a new replacement rear hatch window as a good-will customer accommodation. However, Acura and the dealership told Ms. Smith to take her Vehicle to a body shop at her own expense to remove the remaining glass shards that had fallen into the rear hatch.

78.     Prior to purchasing the Vehicle, none of the representations received by Plaintiff Smith contained any disclosure relating to any defect in the rear hatch window. Had Defendant disclosed that the rear hatch window in the Vehicle was defective, posing a safety risk, Plaintiff Smith would not have purchased it, or would have paid less for the Vehicle.

79.     Plaintiff Smith has suffered an ascertainable loss as a result of Defendant's wrongful conduct associated with the Defect including, but not limited to, out-of-pocket costs to replace the rear hatch window and the diminished value of the Vehicle.

80.     Plaintiff Kevin Gross is a Texas citizen residing in Austin, Texas.

SECOND AMENDED CLASS ACTION COMPLAINT

- 13 -

81.     Plaintiff Gross purchased a certified used 2020 Acura RDX on October 6, 2020 from Chevy Chase Acura in Bethesda, Maryland.

82.     Prior to purchasing the Vehicle, Plaintiff Gross was considering competing vehicles from BMW, Audi, and Mercedes.

83.     Plaintiff Gross researched the Vehicle online — including Acura.com, and kbb.com — before deciding to purchase the Vehicle. None of the websites contained any disclosure from Defendant relating to the Defect.

84.     Safety and reliability are very important features for Plaintiff Gross and Plaintiff Gross considers the Defect to be a safety concern, because it can cause the rear hatch window to shatter when the Vehicle is in motion, thereby distracting the driver.

85.     Plaintiff Gross discussed the Vehicle's features with the authorized dealer's salesperson and reviewed the Vehicle's Monroney sticker prior to deciding to purchase the Vehicle. The Monroney sticker on the Vehicle did not contain any disclosure from Defendant relating to the Defect.

86.     None of the representations received by Plaintiff Gross contained any disclosure regarding any Defect related to the Vehicle's rear hatch window. Nor did they disclose that the Vehicle's rear hatch window was prone to spontaneous shattering. Had Defendant disclosed the Defect, Plaintiff Gross would not have purchased the Vehicle, or would have paid less for the Vehicle.

87.     In November 2022, while at traffic light in Round Rock, Texas, Plaintiff Gross suddenly experienced a rear hatch window implosion. There was no evidence of external impact. Rather, all evidence suggested it simply shattered because of the Defect.

88.     Plaintiff Gross immediately pulled over and called 911 and a police officer quickly arrived and took a report. On information and belief, no external cause was identified.

89.     Plaintiff Gross contacted his auto insurer who arranged for rear hatch window replacement at Austin Windshields in Austin, Texas.

90.     On December 1, 2022, Plaintiff Gross paid a $500 insurance deductible to Austin Windshields to replace his rear hatch window.

91.    Prior to purchasing the Vehicle, none of the representations received by Plaintiff Gross contained any disclosure relating to any defect in the rear hatch window. Had Defendant disclosed that the rear hatch window in the Vehicle was defective, posing a safety risk, Plaintiff Gross would not have purchased it, or would have paid less for the Vehicle.

92.    Plaintiff Gross has suffered an ascertainable loss as a result of Defendant's wrongful conduct associated with the rear hatch window Defect including, but not limited to, out-of-pocket costs to replace the rear hatch window and the diminished value of the Vehicle.

**F.    Abhinav Arun Kumar (Michigan)**

93.    Plaintiff Abhinav Arun Kumar is a Michigan citizen residing in Westland, Michigan.

94.    Plaintiff Kumar purchased a new 2019 Acura RDX on November 5, 2018 from Muller's Woodfield Acura in Hoffman Estates, Illinois.

95.    Prior to purchasing the Vehicle, Plaintiff Kumar was considering competing vehicles from BMW, Mercedes Benz, Audi, and Lexus.

96.    Plaintiff Kumar researched the Vehicle online — including Acura.com, cars.usnews.com/cars-trucks, and other internet sources — before deciding to purchase the Vehicle. None of the websites contained any disclosure from Defendant relating to the Defect.

97.    Safety and reliability are very important features for Plaintiff Kumar and Plaintiff Kumar considers the Defect to be a safety concern, because it can cause the rear hatch window to shatter when the Vehicle is in motion, thereby distracting the driver.

98.    Plaintiff Kumar discussed the Vehicle's features with the authorized dealer's salesperson and reviewed the Vehicle's Monroney sticker prior to deciding to purchase the Vehicle. The Monroney sticker on the Vehicle did not contain any disclosure from Defendant relating to the Defect.

99.    None of the representations received by Plaintiff Kumar contained any disclosure regarding any Defect related to the Vehicle's rear hatch window. Nor did they disclose that the Vehicle's rear hatch window was prone to spontaneous shattering. Had Defendant disclosed the Defect, Plaintiff Kumar would not have purchased the Vehicle, or would have paid less for the Vehicle.

100.    In July 2022, while entering his 2019 Acura RDX while it was parked in his driveway at his home in Westland, Michigan, Plaintiff Kumar noticed that his rear hatch window had imploded.

101.    Plaintiff Kumar immediately took his 2019 Acura RDX to Fox Ann Arbor Acura in Ann Arbor, Michigan who quoted him an estimate of $1,160 to replace the rear hatch window. The service representative for Fox Ann Arbor also told Plaintiff Kumar that this was a common issue with these Vehicles and that Acura was aware of the Defect.

102.    Given the amount of the estimate, Plaintiff Kumar sought and received a lower estimate from Clearview Auto Glass. Accordingly, Plaintiff Kumar paid Clearview $594.35 to replace his shattered rear hatch window.

103.    Prior to purchasing the Vehicle, none of the representations received by Plaintiff Kumar contained any disclosure relating to any defect in the rear hatch window. Had Defendant disclosed that the rear hatch window in the Vehicle was defective, posing a safety risk, Plaintiff Kumar would not have purchased it, or would have paid less for the Vehicle,

104.    Plaintiff Kumar has suffered an ascertainable loss as a result of Defendant's wrongful conduct associated with the rear hatch window defect including, but not limited to, out-of-pocket costs to replace the rear windshield and the diminished value of the Vehicle.

**G.    Mark Kroik (New Jersey)**

105.    Plaintiff Mark Kroik is a New Jersey citizen residing in Elizabeth, New Jersey.

106.    Plaintiff Kroik purchased a new 2019 Acura RDX in November 2018 from Springfield Acura in Springfield, New Jersey.

107.    Prior to purchasing the Vehicle, Plaintiff Kroik was considering competing vehicles from Lexus and Tesla.

108.    Plaintiff Kroik researched the Vehicle online — including Acura.com and other internet sources — before deciding to purchase the Vehicle. None of the websites contained any disclosure from Defendant relating to the Defect.

109.    Safety and reliability are very important features for Plaintiff Kroik and Plaintiff Kroik considers the Defect to be a safety concern, because it can cause the rear hatch window to shatter when the Vehicle is in motion, thereby distracting the driver.

110.    Plaintiff Kroik discussed the Vehicle's features with the authorized dealer's salesperson and reviewed the Vehicle's Monroney sticker prior to deciding to purchase the Vehicle. The Monroney sticker on the Vehicle did not contain any disclosure from Defendant relating to the Defect.

111.    None of the representations received by Plaintiff Kroik contained any disclosure regarding any Defect related to the Vehicle's rear hatch window. Nor did they disclose that the Vehicle's rear hatch window was prone to spontaneous shattering. Had Defendant disclosed the Defect, Plaintiff Kroik would not have purchased the Vehicle, or would have paid less for the Vehicle.

112.    On March 6, 2023, while opening the driver's side door to his Vehicle, Plaintiff Kroik witnessed the rear hatch window shatter. There was no evidence of external impact. Rather, all evidence suggested the rear hatch window simply shattered because of the Defect.

113.    Plaintiff Kroik immediately took his 2019 Acura RDX to Springfield Acura who represented to him that he had to pay out of pocket for replacement.

114.    On March 9, 2023, Plaintiff Kroik paid $717.01 to Springfield Acura to replace the shattered rear hatch window in his Vehicle.

115.    Prior to purchasing the Vehicle, none of the representations received by Plaintiff Kroik contained any disclosure relating to any defect in the rear hatch window. Had Defendant disclosed that the rear hatch window in the Vehicle was defective, posing a safety risk, Plaintiff Kroik would not have purchased it, or would have paid less for the Vehicle.

116.    Plaintiff Kroik has suffered an ascertainable loss as a result of Defendant's wrongful conduct associated with the rear hatch window defect including, but not limited to, out-of-pocket costs to replace the defective rear hatch window and the diminished value of the Vehicle.

**H.    Ryan Collins (Oregon)**

117.    Plaintiff Ryan Collins is a citizen of Washington residing in Ridgefield, Washington.

118.     Plaintiff Collins purchased a 2019 Acura RDX on April 26, 2019 from Ron Tonkin Acura in Portland, Oregon.

119.     Prior to purchasing the Vehicle, Plaintiff Collins was considering competing vehicles from Toyota and Chevrolet.

120.     Plaintiff Collins researched the Vehicle online — including Acura.com and consumerreports.org — before deciding to purchase the Vehicle. None of the websites contained any disclosure from Defendant relating to the Defect.

121.     Safety and reliability are very important features for Plaintiff Collins and Plaintiff Collins considers the Defect to be a safety concern, because it can cause the rear hatch window to shatter when the Vehicle is in motion, thereby distracting the driver.

122.     Plaintiff Collins discussed the Vehicle's features with the Acura authorized dealer's salesperson and reviewed the Vehicle's Monroney sticker prior to deciding to purchase the Vehicle. The Monroney sticker on the Vehicle did not contain any disclosure from Defendant relating to the Defect.

123.     None of the representations received by Plaintiff Collins contained any disclosure regarding any Defect related to the Vehicle's rear hatch window. Nor did they disclose that the Vehicle's rear hatch window was prone to spontaneous shattering. Had Defendant disclosed the Defect, Plaintiff Collins would not have purchased the Vehicle or would have paid less for the Vehicle.

124.     The rear hatch window in Plaintiff Collins' Vehicle shattered on October 27, 2023, immediately after Plaintiff Collins entered the Vehicle and shut the driver's door. There was no evidence of external impact. Rather, all evidence suggested it simply shattered because of the Defect.

125.     Plaintiff Collins paid a $100 insurance deductible to get the shattered rear hatch window replaced on October 27, 2023.

126.     As a result of the glass shattering, a substantial amount of glass shards fell inside the Vehicle's rear hatch. In fact, Plaintiff Collins could hear the glass pieces shifting and moving when he opened and closed the hatch and when his Vehicle was in motion.

127. So, Plaintiff Collins called another Acura dealership located in Portland, Dick Hannah Acura, on October 27, 2023 to schedule an appointment to have the glass shards removed. The appointment was scheduled for November 1, 2023. The service representative at Dick Hannah Acura told Plaintiff that all cost related to removing the glass would be Plaintiff's responsibility since the Vehicle was out of warranty. When Plaintiff Collins responded that the expenses should be covered because the expenses are the result of a known defect identified in an Acura Service Bulletin, the service representative told Plaintiff Collins that because his Vehicle was outside the warranty, all costs related to the shattered rear windshield were the customer's responsibility.

128. Plaintiff Collins then asked the Service Representative why Acura never provided him (as an owner of an Acura RDX covered by the Service Bulletin) a copy of the Service Bulletin. The Service Representative said that Acura does not consider the exploding rear hatch window to be a safety issue, so it was not required to notify consumers.

129. Plaintiff Collins told the Service Representative that a Defect that results in the rear hatch window exploding is most definitely a safety issue.

130. Because Plaintiff Collins was concerned about the hazards presented by the glass shards in the rear hatch, he paid $495 to have the glass shards removed by Dick Hannah Acura on November 1, 2023.

131. Prior to purchasing the Vehicle, none of the representations received by Plaintiff Collins contained any disclosure relating to any defect in the rear hatch window. Had Defendant disclosed that the rear hatch window in the Vehicle was defective, posing a safety risk, Plaintiff Collins would not have purchased it, or would have paid less for the Vehicle.

132. Plaintiff Collins has suffered an ascertainable loss as a result of Defendant's wrongful conduct associated with the Defect, including but not limited to, out-of-pocket costs to replace the rear hatch window and to remove the glass shards from the rear hatch, and diminished value of the Vehicle.

I.      **Lori Perrins (Pennsylvania)**

133. Plaintiff Lori Perrins is a Pennsylvania citizen residing in Yatesville, PA.

134.    Plaintiff Perrins purchased a new 2020 Acura RDX in around November 2019 from MotorWorld Acura in Wilkes-Barre, Pennsylvania. Prior to purchasing the Vehicle, Plaintiff Perrins was considering competing vehicles from BMW and Infiniti.

135.    Plaintiff Perrins researched the Vehicle online—including Acura.com—before deciding to purchase the Vehicle. Acura.com did not contain any disclosures from Defendant relating to the Defect.

136.    Safety and reliability are very important features for Plaintiff Perrins and Plaintiff Perrins considers the Defect to be a safety concern, because it can cause the rear windshield to shatter when the Vehicle is in motion, thereby distracting the driver.

137.    Plaintiff Perrins discussed the Vehicle's features with the authorized dealer's salesperson and reviewed the Vehicle's Monroney sticker prior to deciding to purchase the Vehicle. The Monroney sticker on the Vehicle did not contain any disclosure from Defendant relating to the Defect.

138.    None of the representations received by Plaintiff Perrins contained any disclosure regarding any Defect related to the Vehicle's rear windshield. Nor did they disclose that the Vehicle's rear windshield was prone to spontaneous shattering. Had Defendant disclosed the Defect, Plaintiff Perrins would not have purchased the Vehicle, or would have paid less for the Vehicle.

139.    In or around March 2022, Plaintiff Perrins parked her Vehicle safely and securely in her driveway free of any damage only to discover the next morning that her rear window at imploded.

140.    Accordingly, Plaintiff Perrins was forced to take her Vehicle to Safelight and pay $486 out-of-pocket to replace the rear windshield.

141.    In or around January 2024, once again, Plaintiff Perrins parked her Vehicle safely and securely in her driveway free of any damage only to discover the next morning that her rear window had imploded.

142.    Once again, Plaintiff Perrins was forced to take her Vehicle to Safelight and pay $486 out-of-pocket to replace the rear windshield.

SECOND AMENDED CLASS ACTION COMPLAINT

143. After second incident in January 2024, Plaintiff Perrins contacted her dealer at MotorWorld Acura to inquire about replacing the rear window at no cost. The dealer told Ms. Perrins that replacement was not covered under her warranty. At the time of Plaintiff Perrins contacted the dealer, the Vehicle had approximately 60,000 miles on the odometer.

144. Prior to purchasing the Vehicle, none of the representations received by Plaintiff Perrins contained any disclosure relating to any defect in the rear hatch window. Had Defendant disclosed that the rear hatch window in the Vehicle was defective, posing a safety risk, Plaintiff Perrins would not have purchased it, or would have paid less for the Vehicle.

145. Plaintiff Perrins has suffered an ascertainable loss as a result of Defendant's wrongful conduct associated with the Defect including, but not limited to, out-of-pocket costs to replace the rear hatch window and the diminished value of the Vehicle.

**J.    Melissa Null (Texas).**

146. Plaintiff Melissa Null is a citizen of Texas residing in Euless, Texas.

147. Plaintiff Null purchased a 2020 Acura RDX in August 2019 from Goodson Acura located in Dallas, Texas.

148. Prior to purchasing the Vehicle, Plaintiff Null considered competing vehicles from Cadillac and Infinity.

149. Plaintiff Null researched the Vehicle online — including Acura.com, Edmunds.com, and other internet sources — before deciding to purchase the Vehicle. None of the websites contained any disclosure from Defendant relating to the Defect.

150. Safety and reliability are very important features for Plaintiff Null and Plaintiff Null considers the Defect to be a safety concern, because it can cause the rear hatch window to shatter when the Vehicle is in motion, thereby distracting the driver.

151. Plaintiff Null discussed the Vehicle's features with the authorized dealer's salesperson and reviewed the Vehicle's Monroney sticker prior to deciding to purchase the Vehicle. The Monroney sticker on the Vehicle did not contain any disclosure from Defendant relating to the Defect.

152.    None of the representations received by Plaintiff Null contained any disclosure regarding any Defect related to the Vehicle's rear hatch window. Nor did they disclose that the Vehicle's rear hatch window was prone to spontaneous shattering. Had Defendant disclosed the Defect, Plaintiff Null would not have purchased the Vehicle, or would have paid less for the Vehicle.

153.    The rear hatch window of Plaintiff Null's Vehicle shattered on January 13, 2022, when Plaintiff Null entered the Vehicle and shut the driver's door. There was no evidence of external impact. Rather, all evidence suggested it simply shattered because of the Defect.

154.    Later in the day, Plaintiff Null drove the Vehicle to Vandergriff Acura located in Arlington, Texas who told her that the damage was not covered under warranty.

155.    Accordingly, Plaintiff Null took the Vehicle to Safelight and paid $543 out-of-pocket to replace the rear hatch window.

156.    Prior to purchasing the Vehicle, none of the representations received by Plaintiff Null contained any disclosure relating to any defect in the rear hatch window. Had Defendant disclosed that the rear hatch window in the Vehicle was defective, posing a safety risk, Plaintiff Null would not have purchased it, or would have paid less for the Vehicle.

157.    Plaintiff Null has suffered an ascertainable loss as a result of Defendant's wrongful conduct associated with the Defect, including but not limited to, out-of-pocket costs to replace the rear hatch window and the diminished value of the Vehicle.

**K.    Jocelyn Bland (Washington)**

158.     Plaintiff Jocelyn Bland is a Washington citizen residing in Renton, Washington.

159.    Plaintiff Bland purchased a certified used 2020 RDX on August 7, 2021 from Acura of Seattle in Tukwila, Washington. Prior to purchasing the Vehicle, Plaintiff Bland was considering competing vehicles from Lexus and Infinity.

160.    Plaintiff Bland researched the Vehicle online — including Acura.com, cars.com, edmunds.com, kbb.com, various Acura forums, and other internet sources — before deciding to purchase the Vehicle. None of the websites contained any disclosure from Defendant relating to the Defect.

161.    Safety and reliability are very important features for Plaintiff Bland and Plaintiff Bland considers the Defect to be a safety concern, because it can cause the rear hatch window to shatter when the Vehicle is in motion, thereby distracting the driver.

162.    Plaintiff Bland discussed the Vehicle's features with the authorized dealer's salesperson and reviewed the Vehicle's Monroney sticker prior to deciding to purchase the Vehicle. The Monroney sticker on the Vehicle did not contain any disclosure from Defendant relating to the Defect.

163.    None of the representations received by Plaintiff Bland contained any disclosure regarding any Defect related to the Vehicle's rear hatch window. Nor did they disclose that the Vehicle's rear hatch window was prone to spontaneous shattering. Had Defendant disclosed the Defect, Plaintiff Bland would not have purchased the Vehicle, or would have paid less for the Vehicle.

164.    In January 2023, while driving her Acura RDX her Vehicle's rear hatch window suddenly shattered. There was no evidence of external impact. Rather, all evidence suggested it simply shattered because of the Defect.

165.    Plaintiff Bland immediately called Acura of Seattle who quoted her over $800 to replace the rear hatch window. Due to the high dollar estimate, Plaintiff asked for and received a referral from Acura of Seattle who recommended Allstar Auto Glass. Therefore, Plaintiff Bland contacted Allstar Auto Glass who replaced the rear hatch window in her Vehicle at a cost of $490, which Plaintiff Bland paid.

166.    On October 28, 2023, Plaintiff Bland saw and heard in real-time the rear hatch window implode again while parked in front of her home. There was no evidence of external impact. Rather, all evidence suggested it simply shattered because of the Defect.

167.    After this second spontaneous implosion event, Plaintiff Bland took the Vehicle to Acura of Seattle who once again quoted her approximately $800 to replace the rear hatch window. Therefore, in October, 2023 Plaintiff Bland again had Allstar Auto Glass replace the rear hatch window in her Vehicle at a cost of $467.30, which Plaintiff Bland paid out of pocket.

168.    Prior to purchasing the Vehicle, none of the representations received by Plaintiff Bland contained any disclosure relating to any defect in the rear hatch window. Had Defendant disclosed that

the rear hatch window in the Vehicle was defective, posing a safety risk, Plaintiff Bland would not have purchased it, or would have paid less for the Vehicle.

169.    Plaintiff Bland has suffered an ascertainable loss as a result of Defendant's wrongful conduct associated with the rear hatch window defect including, but not limited to, out-of-pocket costs to replace the rear hatch window and the diminished value of the Vehicle.

**L.      Defendant American Honda Motor Company, Inc.**

170.    Defendant American Honda Motor Company, Inc. is a California corporation, and is a North American subsidiary of Honda Motor Company, Ltd. Defendant is headquartered in Torrance, California and maintains its central operations in California.

171.    Defendant first opened in the United States as a storefront selling Honda motorcycles in Los Angeles, California in 1959. By 1968, Defendant had sold its millionth motorcycle. Starting in 1969, Defendant began marketing and selling automobiles, with its operations still centered in California.

172.    By 1991, Defendant added production to its U.S. operations and oversaw all aspects of production, including research and development, from its headquarters in California. As a center point of Honda's global operations, Defendant made nearly $2 billion in capital investments in California and exported hundreds of millions of dollars in vehicles and other technology from its exclusive port facilities on the West Coast, at Port Hueneme, California, in 2015.

173.    In 1986, Defendant created its first luxury name marque, Acura. By 2006, Defendant established research and development facilities dedicated solely to its vehicles in Torrance, California with related facilities emerging in subsequent years dedicated solely to the creation of "future Honda and Acura automobile and mobility design concepts" in downtown Los Angeles, California.[4]

174.    From its headquarters in Torrance, Defendant combines product sales, service, and coordinating functions for Honda in North America, and is responsible for the manufacture, development, distribution, marketing, sales, and servicing of Acura-brand automobiles. The decisions

---

[4] *Honda R&D Americas Opens New Advanced Design Studio in Downtown Los Angeles*, Honda (Nov. 28, 2012), https://hondanews.com/en-US/releases/honda-r-d-americas-opens-new-advanced-design-studio-in-downtown-los-angeles.

regarding the marketing and sale of the Vehicles' rear hatch windows and decisions regarding the disclosure or non-disclosure of the Defect were in whole or substantial part made by Defendant in California and were purposefully emanated by Defendant in California.

175.    In this Complaint, when reference is made to any act, deed, or conduct of Defendant or Honda, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Defendant.

176.    Honda sells cars in part via communications that it authorized its dealers to make about Honda vehicles, including the Vehicles discussed herein that are subject to the Defect. This includes authorizing Honda dealers to distribute brochures and other marketing and promotional materials. Honda, through its authorized dealers, has and had the opportunity to disclose all material facts relating to the defective Vehicles.

177.    Authorized Honda dealers are Honda's agents, such that an opportunity to receive information from an authorized Honda dealership is an opportunity to receive information directly from Honda itself. *See Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1226 (9th Cir. 2015). This agency relationship is established by the fact that, among other things: Honda's Acura logo is displayed at authorized dealerships; Honda issues technical bulletins and service instructions to dealerships detailing potential vehicle problems; Honda distributes various advertising and promotional materials to its dealerships, including brochures, booklets, and pamphlets; and under the terms of its express warranty, Honda requires its customers to return to its authorized dealerships for warranty repairs.

178.    Furthermore, Honda's relationship with its dealerships is governed by a dealership agreement that imposes a number of reciprocal obligations on both parties. An example of such a Honda Automobile Dealer Sales and Service Agreement ("Dealership Agreement") is attached as Exhibit C hereto.[5] Among other things, it requires:

---

[5] Although Exhibit C is an example of Defendant's dealership agreements with authorized dealers of Honda-brand vehicles, Plaintiffs allege upon information and belief that Defendant's agreements with Acura-brand dealers contain substantially similar provisions.

- that Honda offer to dealers "general and specialized product information and . . . field sales personnel to advise and counsel Dealer's sales organization on sales-related subjects such as merchandising, training and sales management," (Dealership Agreement § 10.2.A), as well as "general and specialized service and parts training courses" (*id.* § 10.2.B);

- that Honda make available to dealers: (1) "sample copies of building layout plans or facility planning recommendations, including sales, service and parts space and the placement, installation and maintenance of recommended signs[,]" as well as, "from time to time," (2) "representatives . . . to counsel and advise Dealer and its personnel in connection with Dealer's planning and equipping of the Dealership Premises" (*id.* § 10.3);

- that Honda make available "such sales, service and parts manuals, brochures, special service tools, parts displays, and equipment and other data for Honda Products as American Honda deems necessary for Dealership Operations" (*id.* § 10.4);

- that Honda "agrees to maintain a nationwide system of authorized Dealers of Honda Products" and that, "[i]n order that those authorized Dealers may be assured of the benefits of comprehensive advertising of Honda Products," Honda agrees to "establish and maintain general advertising programs in such manner and amount as it may deem appropriate and will make sales promotion and campaign materials available" to dealers (*id.* § 10.5)

- that dealers "promote and sell, at retail to the end user, Honda Products . . . , and promote and render service to the end user," and "provide sales and service of Honda Products within the Dealer's Area of Statistical Analysis at levels as reasonably determined by American Honda" (*id.* § 12.1);

- that dealers "agree[] to establish and maintain an adequate and trained sales, parts and service organization" that includes a "Dealership Manager," "a qualified and on-site Honda-trained service manager, a qualified an on-site Honda-trained parts manager and

a number of competent service and parts personnel" who shall "regularly attend and meet the current minimum level of required training provided by American Honda" (*id.* § 12.3);

- that dealers "agree[] to acknowledge, investigate and resolve satisfactorily all complaints received from customers and/or owners of Honda Products in a prompt, courteous and businesslike manner, in order to secure and maintain the goodwill of the public" and to "promptly report[]" to Honda "[a]ny complaint received by Dealer which . . . cannot be remedied" (*id.* § 13.1);

- that dealers "will follow all reasonable directives and suggestions, and the Policies and Procedures" made by Honda, and that "[a]ll written directives, suggestions, Policies and Procedures contained in any of its bulletins, manuals, or other written or electronic communication . . . which are in effect as of the date of the Dealer Agreement or are issued thereafter, will be deemed a part of [the Dealership Agreement]" (*id.* § 12.9);

- that dealers will "perform any and all warranty, campaign, recall, product-improvement or product-update service in compliance with instructions and directives issued by American Honda, regardless of where (or from which U.S. Honda Dealer) the Honda Product involved was purchased," and that "[t]o protect and maintain the goodwill and reputation of Honda Products and the Honda Trademarks," dealers "agree[] that [they] will not charge any customer for warranty service or any work done in connection with such warranty, campaign, recall, product improvement or update, or any other service for which Dealer is to be reimbursed by American Honda . . . ." (*id.* § 12.12);

- that dealers "understand[] and agree[] that the only warranties that will be applicable to Honda Products will be such written warranty or warranties as may be furnished by American Honda." (*id.* § 14.1);

- that dealers "agree[] that [they] will expressly incorporate any warranty furnished by American Honda with a Honda Vehicle as a part of each order form or other contract for the sale of such Honda Vehicle by Dealer to any buyer," "agree[] that [they] will

deliver to the buyer of all Honda Products, at the time of delivery of such Honda Products, copies of such applicable warranties as may be furnished by American Honda," and "agree[] to abide by and implement in all other respects American Honda's warranty procedures in effect at the time of Dealer's sale" (*id.* § 14.2);

- that dealers "agree[] to develop and actively utilize sales, parts and service programs for the advertisement, promotion and servicing of Honda Products." The provision further states: "Such programs will include the prominent display and use or demonstration of Honda Products. Dealer further agrees to cooperate with all reasonable promotional programs developed by American Honda" (*id.* § 15.1);

- that dealers "agree[] that [they] will not advertise, promote or trade in Honda Products or the servicing thereof in such a manner as to injure or be detrimental to the goodwill and high-quality image and reputation of American Honda or the Honda Trademarks." The provision further states: "Dealer further agrees that it will not publish or otherwise disseminate any advertisement or announcement or use any form or medium of advertising which is objectionable to American Honda. Dealer agrees to discontinue immediately any advertisement or form of advertising deemed objectionable upon request of American Honda" (*id.* § 15.2);

- that dealers "agree[] to erect and maintain, at the Authorized Location . . . authorized product signs as required by American Honda . . . as well as such other authorized signs as are necessary to advertise the Dealership Operations effectively, and as are required by American Honda" (*id.* §15.4);

- that dealers "agree[] that American Honda has the exclusive right to use and to control the use of the Honda Trademarks and, but for the right and license granted by [this Dealership Agreement] to use and display the Honda Trademarks, Dealer would have no right to use the same" (*id.* § 16.1);

- that dealers are "granted the non-exclusive right and license to use and display the Honda Trademarks at the Dealership Premises and in connection with advertising for

SECOND AMENDED CLASS ACTION COMPLAINT
- 28 -

the Authorized Location." The provision further states: "Such use or display is limited to that which is necessary in connection with the sale, offering for sale and servicing of Honda Products at retail at the Authorized Location . . . . Dealer agrees that it will promptly discontinue the use of any of the Honda Trademarks, or change the manner in which any of the Honda Trademarks are used when requested to do so by American Honda" (*id.* § 16.2);

- that dealers "agree[] to keep complete and current records and to promptly prepare for American Honda such reports, based on such records, as American Honda may reasonably request pursuant to the Policies and Procedures." The provision further states: "All records required to be maintained by Dealer pursuant to [this Dealership Agreement] shall be kept in such manner and format so as to be readily accessible, retrievable and reproducible by Dealer for review and audit by American Honda . . . ." (*id.* § 17.3);

- that dealers "agree[] to permit, during reasonable business hours, American Honda, or its designee, to examine, audit, reproduce and take copies of all reports, accounts and records pertaining to the sale, servicing and inventorying of Honda Products, including, but not limited to, records in support of claims for reimbursement or credit from American Honda, and, with the prior approval of Dealer, which approval will not be unreasonably withheld, to interview Dealer employees with respect thereto . . . ." (*id.* § 17.4);

- that the Dealership Agreement may be terminated if the dealer fails "to perform adequately as to its advertising and promotional responsibilities" or its "sales service, parts or customer satisfaction responsibilities" as "determined by American Honda" (*id.* §§ 20.4N-O). The Dealership Agreement further provides that "not later than the effective date of the termination of the Dealer Agreement, Dealer[s] will, at [their] sole expense, discontinue any and all uses of any Honda Trademarks and any words, symbols and marks which are confusingly similar thereto; will remove all signs bearing

any Honda Trademark; and will destroy all stationery, repair orders, and advertising and solicitation materials, and all other printed matter bearing any Honda Trademark or referring directly or indirectly to American Honda or Honda Products in any way which might make it appear to members of the public that Dealer is still an authorized Dealer. The foregoing will include, but not be limited to, discontinuing the use of any Honda Trademark as part of Dealer's business and corporate name. Dealer will also deliver to American Honda, at American Honda's place of business, or to a person designated by American Honda, or will destroy the same upon request by American Honda, any and all technical service or parts literature, and advertising and other printed material then in Dealer's possession which relates to Honda Products and which was acquired or obtained by Dealer from American Honda. Dealer will destroy any sign bearing a Honda Trademark which has not been repurchased by American Honda" (*id.* § 21.3).

**M.    Privity Exists Between Defendant and Plaintiffs and Class Members**

179.    Plaintiffs and Class members purchased their respective Vehicles from Defendant, through Defendant's authorized dealerships with the understanding that these dealerships were acting as agents of Defendant. Defendant markets its Vehicles directly to consumers and maintains a direct relationship with purchasers. Defendant's authorized dealers and service professionals are agents of Defendant and their participation in the sale, maintenance, and repair of Vehicles at the direction and under the supervision of Defendant does not interrupt the direct relationship between Defendant and Vehicle purchasers. Plaintiffs and the Class members purchased their Vehicles directly from Defendant through Defendant's actual or apparent agents.

180.    The sole and express purpose that each authorized dealership has when it acquires Vehicles from Defendant is to immediately re–sell them to the end–users like Plaintiffs and Class members. Defendant's conduct, and the conduct of their respective dealerships, thus created a justifiable belief on the part of Plaintiffs and Class members that the dealerships are agents of

Defendant, which Plaintiffs relied on to their detriment. Thus, each authorized dealership operates as the actual and/or apparent agent of Honda, which satisfies any privity requirement.

181.    Privity further exists between Defendant on the one hand, and the Plaintiffs and Class members on the other, by virtue of the express warranties provided through their purchase agreements.

182.    Defendant also controls various details regarding its dealerships' operations through various written agreements, such as: (i) granting each dealership a license to use its trademarks and intellectual property; (ii) furnishing each dealership with marketing materials to assist in the sale of their vehicles; (iii) providing training to dealership personnel to assist in their sales activities; and (iv) prohibiting their dealerships from engaging in certain practices that otherwise detract from their respective brands or undermine the sale of their respective vehicles, including the Class Vehicles

183.    Honda was and is in actual or constructive privity with Plaintiffs and Class members.

184.    Plaintiffs and Class members had and continue to have sufficient direct dealings with Honda and/or its authorized dealers, franchisees, representatives, and agents to establish any required privity of contract. Honda's authorized dealers, franchisees, representatives, and agents were not intended to be the ultimate consumers of the Vehicles and have no rights under the warranty agreements provided with the Vehicles. The warranty agreements were designed for and intended to benefit only the ultimate purchasers and lessees of the Vehicles, i.e., Plaintiffs and Class members.

185.    Privity exists because Defendant expressly warranted to Plaintiffs and members of the Class through the warranting, website, packaging, advertising, marketing, and labeling that the Vehicles were high quality, safe, and suitable for transportation, and by failing to make any mention of or disclose the existence of the dangerous Defect.

186.    Moreover, any privity requirement is satisfied  because Plaintiffs and Class members are intended third-party beneficiaries of contracts between Defendant and its dealers, franchisees, representatives, and agents. Plaintiffs and the Class members were the intended and direct beneficiaries of agreements between Defendant and its dealerships regarding sales of the Vehicles, because, upon information and belief, the agreements expressly were made for the direct benefit of Plaintiffs and Class members as ultimate consumers of the Vehicles. For instance, Defendant's agreements with its

authorized dealers require them to "expressly incorporate any warranty furnished by American Honda with a Honda Vehicle as a part of each order form or other contract for the sale of such Honda Vehicle by Dealer to any buyer." The authorized dealers were not intended to be the ultimate consumers of the Vehicles and have no rights under the warranties, which were designed for and intended to benefit consumers only such as Plaintiffs and Class members.

187.    By extending express written warranties to end-user purchasers, Honda brought itself into privity with Plaintiffs and class members.

188.    Moreover, Defendants' false and misleading representations in marketing materials and brochures and labels for each of the Class Vehicles, were intended for car purchasers, rather than the dealerships themselves.

## IV.    FACTUAL ALLEGATIONS

### A.    The Rear Hatch Window Defect

189.    Honda manufactures, markets, and distributes mass produced automobiles in the United States under the Acura brand name.

190.    The Acura RDX is a perennial top seller in the premium compact SUV segment with cumulative U.S. sales exceeding 663,000 units since its debut in 2006.[6]

191.    The current, third generation of the Acura RDX was released in June 2018 (2019 model year).

192.    The Vehicles are mid-sized SUVs equipped with a standard rear gate that includes a rear hatch window.

193.    The rear hatch window includes an electrical defroster grid that can be used to heat the rear window.

194.    Since its debut, the third generation RDX has suffered an unprecedented number of spontaneous rear hatch window failures.

---

[6] *Acura RDX US Sales Figures*, CarFigures (updated Aug. 2, 2024), https://carfigures.com/us-market-brand/acura/rdx.

195.    On June 10, 2022, after nearly two years of receiving a consistent barrage of NHTSA complaints, online complaints, warranty claims, and other various notices, and, according to the anonymous tip outlined above, despite having known of the Defect at least as early as the Vehicle's June 2018 launch, Defendant finally released a "Service Bulletin" announcing that all 2019 model year RDXs and certain 2020 model year RDXs suffered from a defect that caused the rear hatch window to shatter or break "with no external impact."[7]

196.    The June 10, 2022 Service Bulletin identified the cause of the spontaneous rear windshield glass shattering as an "[i]ncorrect specification for the rear defroster grid."[8]

197.    Yet Defendant's fix, as Defendant stated in the Service Bulletin and directed dealerships to undertake, is simply to replace defective windshields with equally defective windshields. Indeed, the Service Bulletin calls for replacement of the defective windshield with another of the same part number. This "fix," however, does not actually cure the fundamental issue, as evidenced by Vehicle owners experiencing multiple rear hatch window shattering like Plaintiff Bland.

198.    As discussed, the rear hatch window plays a critical role in modern vehicles. Yet Vehicle owners are being forced to drive dangerous and unsafe Vehicles with rear hatch windows that spontaneously shatter at any given moment, even if the rear hatch window had already been "repaired" by Defendant pursuant to its Service Bulletin.

**B.    Defendant Knew of the Defect Before Plaintiffs Purchased the Vehicles.**

199.    Defendant has long known or should have known of the Vehicles' rear hatch window problems from multiple sources. These sources include its own employees, pre-release design, manufacturing, and testing data; warranty claims data; consumer complaints made directly to Defendant, collected by NHTSA and/or posted on public online forums; testing done in response to those complaints; aggregate data and complaints from authorized dealers; and other sources. Yet,

---

[7] *Acura Service Bulletin 22-014* (June 10, 2022), *available at* https://static.nhtsa.gov/odi/tsbs/2022/MC-10215489-0001.pdf. The June 10, 2022 Service Bulletin, entitled 22-014 Rear Windshield Glass Shattering, was amended on October 28, 2022 to change the range of VIN numbers of Vehicles in model year 2020 that were affected by the defect. *See* Exhibit D.

[8] *Acura Service Bulletin 22-014* (June 10, 2022), *supra* note 6.

Defendant failed to disclose and actively concealed the Vehicles' Defect from the public, and continued to manufacture, distribute, and sell the Vehicles. Defendant continues to fail to disclose and actively conceals this Defect from consumers prior to purchase.

**C.      Defendant's Employees Alerted Defendant to the Defect**

200.    Based upon an anonymous communication recently received by Plaintiffs' counsel from an individual who claims to have worked at the East Liberty, Ohio assembly plant where the Vehicles were and are produced, Defendant has known about the propensity of the Vehicles' rear hatch windows to spontaneously shatter since at least as early as the launch of these Vehicles in June 2018.

201.    According to this anonymous communication, a Vehicle Quality driver experienced a spontaneously exploding rear hatch window while test driving a Vehicle.

202.    A second example involved a Vehicle that was returned from the shipping lot because the rear hatch glass seemingly has shattered for no apparent reason.

203.    A third instance involved a Vehicle inside the East Liberty, Ohio assembly plant. While the Vehicle was idling past, one or more of Defendant's employees witnessed the rear hatch window spontaneously shatter.

204.     Defendant even implemented a test at the East Liberty, Ohio assembly plant whereby each Vehicle's rear hatch window was struck with a rubber mallet to see if the glass would shatter. Dozens of rear hatch windows in the Vehicles shattered during these tests.

205.    The Defect was so pervasive and presented obvious safety hazards for Defendant's employees that Defendant implemented a new safety protocol requiring certain assembly employees to wear extra personal protective equipment such as face shield or goggles while installing rear hatch windows.

206.    To protect the interior of new Vehicles from glass shrapnel caused by the Defect, Defendant even began installing a wrapping material on the inside of the rear hatch glass.

**D.    Pre-Release Design, Manufacturing, and Testing Data Alerted Defendant**

207.    It is standard practice for automobile manufacturers to engage in extensive pre-launch testing of their vehicles. Honda did so for the defective Vehicles and tested the rear hatch windows and defrosters before selling the defective Vehicles.

208.    Given the immediacy and frequency of consumer complaints about the shattering of the rear hatch windows in the Vehicles and the anonymous communication from an employee of Defendant attached as Exhibit B, it is apparent that Honda learned about the Defect prior to putting the Vehicles up for sale.

**E.    Warranty Claims Data Alerted Defendant**

209.    Honda also knew or should have known about the Defect based on the large number of warranty repairs related to rear hatch window repairs.

210.    Upon information and belief, Honda regularly compiles and analyzes detailed warranty service information regarding repairs performed under warranty at its network of dealerships. Indeed, Honda requires dealers to maintain detailed and meticulous records for any warranty repairs performed and routinely refuses to pay for warranty repairs made where the nature and cause of the malfunction is insufficiently described.

211.    Upon information and belief, these dealer service records and warranty data reflect an abnormally large spike in shattering rear hatch windows for the Vehicles.

212.    The complete warranty repair data regarding repeated rear hatch window failures put Honda on notice of the Defect.

**F.    Complaints Made Directly to Honda Alerted Honda to the Defect**

213.    Honda also knew or should have known of the Defect based on the numerous complaints it received directly from customers. The large number of complaints, and the consistency of their descriptions of the rear hatch window failures, alerted Honda of the Defect.

214.    Only Defendant has access to the full universe of complaints it received regarding the Vehicles' spontaneously shattering rear hatch windows. However, upon information and belief, many Vehicle owners who experienced the Defect complained to Honda. The large number of complaints should have alerted Defendant to the Defect.

**G.      Complaints Collected by NHTSA Alerted Defendant**

215.    Vehicle manufacturers are required by federal law to maintain close contact with the NHTSA regarding potential safety defects. By law, manufacturers are required to report information regarding customer complaints and warranty claims to NHTSA, and federal law imposes criminal penalties against manufacturers who fail to disclose known safety defects. *See generally* Transportation Recall Enhancement, Accountability, and Documentation (TREAD) Act, Pub. L. No. 106-414, 114 Stat. 1800 *et seq.* (2000).

216.    Automakers have an affirmative legal duty to disclose emerging safety-related defects to the NHTSA under the Early Warning Reporting requirements. *Id*.

217.    Vehicle manufacturers should and do monitor NHTSA databases for consumer complaints as part of their ongoing obligation to uncover and report potential safety-related defects. Accordingly, Honda knew or should have known of the many complaints about the shattering rear hatch windows lodged with the NHTSA, and the sheer number of complaints coupled with their consistency alerted or should have alerted Honda to the Defect.

218.    A sampling of the complaints about the Defect posted on the NHTSA database include the following:

- "GOT IN DRIVER SEAT CLOSED THE DOOR AND THE REAR WINDOW SHATTERED NO PRIOR DAMAGE TO WINDOW. IT WAS PARKED IN THE DRIVEWAY" NHTSA ID Number: 11384857. Incident Date December 24, 2020.

- "TL* THE CONTACT OWNS A 2020 ACURA RDX. THE CONTACT STATED WHILE THE VEHICLE WAS STATIONARY AND WHILE SCRAPING ICE OFF THE REAR HATCH WINDSHIELD, THE WINDSHIELD FRACTURED. THE VEHICLE WAS TAKEN TO JOE RIZZA ACURA (8150 W 159TH ST, ORLAND PARK, IL 60462) WHERE IT WAS DIAGNOSED WITH THE REAR HATCH WINDSHIELD NEEDED TO BE REPLACED. THE DEALER INFORMED THE CONTACT THAT THIS WAS A DESIGN DEFECT AND REPLACED THE HATCH DOOR AND THE WINDSHIELD. THE CONTACT STATED THAT THE WINDSHIELD WAS REPLACED, BUT THERE WAS STILL PIECES OF BROKEN

GLASS LEFT INSIDE THE HATCH." NHTSA ID Number: 11403144. Incident Date February 15, 2021.

- "Car was parked in the garage[.] [W]oke up in the morning found my car back window glass shattered" NHTSA ID Number: 11447614. Incident Date November 21, 2021.

- "When closing driver side door, rear window shattered and blew out." NHTSA ID Number: 11447414. Incident Date December 20, 2021.

- "My rear windshield popped while my car was parked in my workplace without hitting any thing on it . i read on line lots of owner for Acura had a same problem." NHTSA ID Number: 11446462. Incident Date December 22, 2021.

- "Rear windshield shattered while parked in my drive way. Vehicle was not being driven. I have read several reports of this happening to other Acura rdx. I have contacted the dealership and Acura who have both told me I need to pay out of pocket to get this fixed. This is an Acura problem and Acura was unable to help. I should not be responsible for getting this fixed as vehicle was in driveway when this happened. I have been without a vehicle since this happened on 12/24. I'm very unsatisfied with Acura." NHTSA ID Number: 11445399. Incident Date December 24, 2021.

- "Rear glass window shattered out of nowhere. Thankfully the car was parked when it happened. It's bound to happen on these cars and when reported to Acura they did nothing. My car was parked in front of my house all night with a camera recording it and there was nothing else that could've happened to it. Also, when inspected, you can tell the glass was not impacted in anyway. It shattered from the inside out. There was no warning lights or anything prior to the incident. On a side note, I believe this problem is covered under warranty in Canada but not in the US, which means Acura knows about the problem but isn't doing anything about it here." NHTSA ID Number: 11498858. Incident Date December 25, 2021.

- "Rear window spontaneously exploded while opening my door to enter. There are no replacement glass available from Acura, I am forced to drive with plastic and duct tape

covering my rear window. Acura denies there is a problem/ that hey are at fault. The are currently daily posts on the 3rd Gen Acura RDX Facebook group of owners rear window spontaneously exploding. This has been a know issue with owners since 2019, however the frequency of the rear glass exploding has increased dramatically." NHTSA ID Number: 11447734. Incident Date January 4, 2022.

- "I opened my driver's side door and sat down when I heard a crack sound. I turned around and heard a louder crack sound and saw my back window was shattered. I called Acura twice and spoke to two different agents and both stated they never heard of this happening nor were there any bulletins about this being an issue. I called three Acura dealerships near me and all three stated they have never heard of this issue even though I've heard of this happening multiple times in my Acura owners group discussions. The last dealership I spoke with asked for me to drive it to them so they could see it. While driving there the glass just continued to drop inside my cargo trunk. The dealership is supposed to be checking with their district manager tomorrow but didn't sound optimistic. They did check with parts and the rearview glass is on backorder with no ETA and other Acura owners have been waiting months to get theirs replaced. I feel this is a much bigger issue and is a defect in the design of this model based on what I've heard and have now experienced firsthand." NHTSA ID Number: 11447429. Incident Date January 13, 2022.

- "Back windshields have been spontaneously shattering. Sitting in my car parked for 20 minutes waiting for my son and the back window shattered…all the edges with a strange crack and the glass appeared shattered…ran my hand across it and cut my finger. People that came over to the car had me lift the hatch and the center of the window fell in. I joined an RDX owner Facebook page and it seems like this is happening to a lot of people." NHTSA ID Number: 11447941. Incident Date January 13, 2022.

- "Back windshield spontaneously shattered[.]" NHTSA ID Number: 11447607. Incident Date January 13, 2022.

- "As normal I remote started my vehicle. Walked over to my vehicle opened my driver door and closed it normal[.] [A]ll of a sudden my rear window shattered!" NHTSA ID Number: 11447486. Incident Date January 13, 2022.

- "Rear windshield spontaneously shattered while car was idle. Seems to be a common issue especially in the cold. Outside temp was about 20F when it happened." NHTSA ID Number: 11451524. Incident Date January 27, 2022.

- "The rear windshield shattered unexpectedly while the car was parked. Seem that others might be having the same issues." NHTSA ID Number: 11449891. Incident Date January 30, 2022.

- "The rear hatch window unexpectedly blows out and shattered glass, without warning. No impact involved." NHTSA ID Number: 11449822. Incident Date January 30, 2022.

- "I got in my vehicle, closed the driver door and heard a loud 'pop' followed by the sound of glass falling. Turned around and saw a giant hole in the middle of my rear windshield. Got out to investigate and noticed the rear window was completely shattered all the way to the edges of the glass. There are multiple reports of this happening and yet Acura USA refuses to acknowledge it. Instead, forcing us to file an insurance claim when in fact this is faulty glass, and should be covered by Acura. It's 2022, a simple google search will show how common this issue has become. Acura needs to be held accountable and something needs to be done about this immediately." NHTSA ID Number: 11451772. Incident Date January 31, 2022.

- "Opened my Acura RDX car door, sat down, closed the door - and then my rear windshield shattered and collapsed into my trunk. I knew of no damage to it - the car is a 2020, relatively new - This incident caught me my complete surprise. Searched on internet, and see similar complaints from other Acura owners about exploding rear windshields after closing driver side door." NHTSA ID Number: 11450324. Incident Date February 1, 2022.

- "On the date of the incident, I remotely started my car from the office before leaving for the day. I got into my vehicle shut the door, started the vehicle (push start), and heard a loud sound that sounded like a gunshot and something shattering. I looked around my surroundings and noticed my rearview window was shattered. The rear window had a large hole slightly just above the rear wiper. I immediately went back into the office to tell one of my co-workers what occurred. My co-worker assisted me with cleaning up the glass and securing the window to get home safely. After arriving home, I called to report the incident to my insurance company and was advised to follow-up the next morning. Later that night I discovered this has been occurring with multiple Acura RDX vehicles in the US and Canada. The next morning I immediately called Rosenthal Acura to report the incident to my service advisor. I asked him if Acura was aware of this occurring with other vehicles. I was told he was aware this occurred with another vehicle but, I was told the corporate office has not made the dealership aware of this occurring with any other vehicles. As a result, it was suggested that I report the incident to my insurance provider. This appears to be an issue with multiple 2019-2021 Acura RDX drivers in the US and Canada. The Canadians appear to be acknowledging the issue and fixing the vehicles. The US needs to protect the consumers and immediately recall and inspect these vehicles. Some drivers are reporting this incident occurring on multiple occasions. I am grateful this did not happen while I was driving home. The idea of glass shattering while driving could be dangerous for the driver, passengers, and others on the highway. This is a safety problem that needs to be immediately addressed." NHTSA ID Number: 11450222. Incident Date February 1, 2022.

- "I would like to filed a safety issue dues shatter rear window on my 2019 Acura RDX. Around 1:47 pm on 2/2/2022 I got in my car and start it up and I hear a pop I look back to see what was going on then noticed my rear window was shatter I then got out off the car to inspect what was going on I didn't not see any Visual impact and item that

could damage or shatter my rear window. The temperature at that time was mid 51 degrees and the rear defrost was not active. I have recording and pictures to prov[ide] as evidence if need. I believe my car is not the only one with this happening there lots in this particular make and model are having the same issue. This happened at my work parking lot C19 at Boeing Algona Washington" NHTSA ID Number: 11450504. Incident Date February 2, 2022.

- "I happened to be driving and out the nowhere my rear back trunk window shattered, mind that this is the second time this happens one last year my truck was sitting in the garage and I close my door and just hear a loud bang and my back glass shattered." NHTSA ID Number: 11450726. Incident Date February 6, 2022.

- "On Feb 14, the back window exploded and shattered on its own, additional the fron[t] windshield was cracked from one side to the next. I came out of my office to find a hole in the back window, shattered glass every where[.] No one was in or around the vehicle, no vandalism or impact occur[r]ed to the car. Now the remaining pieces of shattered glass are in the door which could not be removed. This is the 1st car I have ever had to have this type of issue. I have been a loyal Honda car owner for over 15 years. I lease this car in Sept 2021, I'm not sure why the window would be exploding on its own." NHTSA ID Number: 11453340. Incident Date February 14, 2022.

- "The contact owns a 2020 Acura RDX. The contact stated that while the vehicle was parked at her residence, a loud sound was heard coming from outside. Upon inspection, the contact noticed that the rear windshield had shattered and there were glass shards on the driveway and inside of the vehicle. There was no impact to the rear windshield that could have caused it to shatter. An auto glass company was made aware of the failure but informed the contact that parts were on backorder. The vehicle was taken to the dealer and the contact was referred to the manufacturer. The vehicle was not repaired and remained at the dealer. The manufacturer was made aware of the failure and a case was opened. The manufacturer informed the contact that the cold temperature

caused the failure. The failure mileage was approximately 19,000." NHTSA ID Number: 11454896. Incident Date February 27, 2022.

- "The contact owns a 2020 Acura RDX. The contact stated that while the vehicle was parked, she approached the rear of the vehicle to open the hatch and noticed that the edges of the rear window was crumbling. The contact stated that upon opening the hatch, the middle of the hatch window cracked and the pieces fell inside the trunk. The vehicle was towed to the dealer, who informed the contact that they could not determine that the failure was a Manufacturer's defect. The vehicle was not repaired. The manufacturer was notified of the failure and informed the contact that they could not assist unless the dealer determined that it was a Manufacturer's defect. A case was opened. The failure mileage was approximately 22,908." NHTSA ID Number: 11455536. Incident Date March 4, 2022.

- "Rear glass shattered right after I got into my car and closed my door, 100% sure I'm not the only one having this issue. Acura RDX 2019" NHTSA ID Number: 11456431. Incident Date March 7, 2022.

- "Got into the RDX, closed the driver door and rear glass shattered. Called Dealership and spoke with salesman and service manager and both said they never heard of this before. Reading online this has happened several times. Acura in Canada has acknowledged that this is a defect and repairs are done under warranty. What can be done in USA?" NHTSA ID Number: 11462859. Incident Date April 30, 2022.

- "On two occasions now my vehicle was parked at the train station and I have returned to the back window being cracked. The first time (11/21) when I shut the rear passenger door I heard the glass crack. There was a small hole near the bottom center which quickly expanded as doors were closed. The second time (8/22) I walked up to my vehicle and there was a large hole in the rear window which looked exactly the same. Both times glass was also broken around the edges. We are confident it is not vandalism due to the fact that the vehicle was parked in an open well-monitored area, nothing was

taken and no other cars were damaged. Something must be defective." NHTSA ID Number: 11479781. Incident Date August 16, 2022.

- "The contact owns a 2019 Acura RDX. The contact stated that upon entering the vehicle, he closed the front driver's side door and the rear window glass exploded. No warning light was illuminated. The vehicle was taken to an independent mechanic where the failure could not be duplicated. The dealer was not notified of the failure. The manufacturer was notified of the failure and informed the contact that the vehicle was out of warranty. The manufacturer suggested that the vehicle be taken to the dealer to be diagnosed. The failure mileage was approximately 50,000." NHTSA ID Number: 11484613. Incident Date September 14, 2022.

- "The rear (trunk) window of my 2019 Acura SUV shattered upon entrance into the vehicle after I closed my driver side door. The vehicle was parked at my place of employment and when I approached the vehicle, the vehicle looked fine, and window was intact. In addition, there prior to the incident, there is no visible crack on the window or indication of attempted theft. There were no lights warning issues. The vehicle has always been serviced by the dealership and never was I informed of any issues with the rear window. This is a safety issue as the window could have shattered while I was driving the vehicle and the sudden shattered cause have harm passengers in the back seat. I was fortunate that I was not driving which may have caused an accident not knowing what could have occurred on the road especially on a freeway." NHTSA ID Number: 11492017. Incident Date October 27, 2022.

- "Rear windshield shattered. No explanation. I had no tree branches near or on by my car. Car was parked in my driveway. I called Acura corporate and at this time no recall." NHTSA ID Number: 11499284. Incident Date November 24, 2022.

- "On November 26, 2022 RDX rear glass shattered while parked. This was reported to ACURA to find out if this is a known defect. Acura replied that they don't have a recall on this problem. Coincidentally, few days after glass was replaced (insurance) the

remote start failed due to 'open trunk, doors or hood[.]' Acura dealer replace defective trunk switch." NHTSA ID Number: 11501937. Incident Date November 26, 2022.

- "The contact owns a 2019 Acura RDX. The contact stated that after she exited the vehicle, her husband closed the front passenger's side door, and she heard a crack. The contact stated that the rear window had shattered. The dealer was notified of the failure and the contact was informed that the glass could be ordered; however, the vehicle was not repaired. The manufacturer was notified of the failure and the contact was informed that the warranty had expired. The failure mileage was approximately 40,000." NHTSA ID Number: 11497744. Incident Date December 8, 2022.

- "Rear windshield shattered as driver shut the driver door after entering the car. There was no sign of anything hitting the glass. There was an Acura TSB for this exact problem but my dealer refuse to acknowledge." NHTSA ID Number: 11497368. Incident Date December 13, 2022.

- "The contact owns a 2020 Acura RDX. The contact stated that while the vehicle was parked, the rear window shattered without warning or impact. The vehicle was taken to the dealer; however, the vehicle was not diagnosed. The contact was advised to notify the insurance company of the failure. The vehicle was not repaired. The manufacturer was notified of the failure and the contact was advised to go through the insurance company and to take the vehicle to a different dealer for diagnosis. The failure mileage was approximately 20,000." NHTSA ID Number: 11498695. Incident Date December 13, 2022.

- "2019 Acura RDX Advance - Upon entering driver side and closing driver door, rear hatch glass shattered. Vehicle was stationary in my closed garage in Upstate NY after being parked overnight and was then remote started to warm up. Approx. overnight temps were in the teens. There was no evidence of any prior damage to the glass. Damage to the window is more in the lower center above the rear wiper mount." NHTSA ID Number: 11497458. Incident Date December 14, 2022.

- "At the end of the work day, I approached my car that had been remotely started through the app approximately 5 minutes prior. I put my work bag in the back driver side, closed the door, then heard small items hitting the ground. I went to the back of the car and found the back window on the lift gate shattered. The door wasn't slammed. The lift gate has only ever been operated with the power feature." NHTSA ID Number: 11500925. Incident Date January 9, 2023.

- "The back windshield just shattered when I closed the drivers door. I looked online and it seems like a known issue and Acura is not taking any responsibility for it." NHTSA ID Number: 11501441. Incident Date January 12, 2023

- "On January 16, 2023, at approximately 5:00 PM, I returned to my vehicle, a 2019 Acura RDX in a secured parking lot after work, got into the driver's seat, closed the door, turned on the vehicle, and my rear windshield spontaneously shattered without any signs whatsoever of external impact. The entire rear windshield shattered from end to end without explanation. Upon further researching this issue, it appears to be a common problem with several model years of the Acura RDX. I reported this incident to Acura, corporate customer relations, who declined to offer any assistance for the problem, despite there being a technical service bulletin issued for this problem for all 2019 Acura RDX VINs. I was fortunate that this did not occur while my vehicle was in motion, however, the problem poses a serious safety issue that Acura refuses to do anything about. I'm not sure why they would issue a TSB yet decline to authorize a repair or replacement of the windshield. This is a common problem that is known to Acura and poses a safety issue to the motoring public." NHTSA ID Number: 11504800. Incident Date January 16, 2023.

- "The rear windshield spontaneously shattered when I got in and closed the door. Temp was better 30-40F. I have seen so many complaints online about similar issue." NHTSA ID Number: 11504057. Incident Date January 24, 2023.

- "I went out, got in the vehicle and before starting, I heard a crinkling/rustling noise. It sounded as if something was in the rear of the vehicle. I got out of the vehicle and walked to the back and the entire rear window glass was shattered. There was no impact, no foreign object hit it, etc. It simply shattered while sitting in the driveway, with the vehicle off, when I closed the door. This is a huge safety risk. I have contacted Acura. There is no current recall, but there is a current safety bulleting regarding this issue. Apparently it has happened to thousands of people who own an RDX model years 2019-2022. I cannot believe that this is not an active recall, given the number of reports and the safety concern." NHTSA ID Number: 11504156. Incident Date January 27, 2023.

- "I was driving on the interstate at 75 miles per hour. The back window literally exploded. There was a very loud boom. Upon pulling over, I discovered that the window had shattered. Part of the glass fell down inside the car. We were not going under an overpass and did not hit anything that would have caused the glass to suddenly shatter. Acura has issued a Technical Service Bulletin (TSB) but not a recall. Since the car was out of warranty, the repair is not covered. The internet is full of posts about unexplained glass shattering on 2019 Acura's. This is a safety issue." NHTSA ID Number: 11505927. Incident Date January 29, 2023.

- "Woke up on 2/11/2023 and my whole rear window was shattered into a million pieces. No signs of anything thrown at or hitting it. Filed insurance claim to replace window but still have glass stuck in between frame and plastic because they can not remove plastics. They are welded to the body of vehicle. No warning signs or alerts. Luckily I was parked in my driveway and not driving when this occur[r]ed. Had I been driving I probably would have caused an accident." NHTSA ID Number: 11507491. Incident Date February 11, 2023.

219. As the preceding complaints demonstrate, Vehicle owners have lodged many complaints with the NHTSA about their rear windshields shattering which alerted or should have alerted Honda to the Defect.

### H.    Customer Complaints on Internet Forums Alerted Defendant

220.    In addition to the complaints lodged directly with Honda, dealers, and NHTSA, many Vehicle owners posted complaints regarding repeated rear hatch window failures on public online internet forums, which Defendant—like most manufacturers—regularly monitors. The following is a representative sample of those complaints:[9]

- "Who's rear windshield shattered out of nowhere? Apparently, Acura says they haven't heard of this happening. I have a 20 RDX aspec. Curious to how many people have experienced this because I know I'm not the only one. Acura should be aware of this but yet they do nothing about it." Jessica Goncalves, *Acura RDX/Aspec*, Facebook (Dec. 27, 2021).

- "Had it happen a month ago on my 2020 RDX A Spec. The worst part about this happening is that there is a bunch of glass that fell into the hatchback door. So every time you open and close it, you hear a ton of glass rolling around in there. The glass company told me I needed to take it to a dealership to have them remove the excess glass from the door because they could not get at it. The dealership also told me that it's very difficult to remove the glass as well and may need to have the entire door replaced. Luckily insurance will cover everything, but it's been a real pain in the ass. Good times!" Jason Woodsmall, *Acura RDX/Aspec*, Facebook (Dec. 28, 2021).

- "Had It happened a few weeks ago, paragon Acura didn't wanna cover It. Spoke to a manager they opened a case with Acura and Acura paid for It. Although just like everyone else I still hear glass in the trunk door" Chris Munoz, *Acura RDX/Aspec*, Facebook (Dec. 28, 2021).

- "Happened to my 2019 Advance about a week ago. My insurance paid 100% of the cost to repair. I had to go to an auto body shop so they could take the whole tailgate apart to get the glass out." Rich Wiley, *Acura RDX/Aspec*, Facebook (Dec. 28, 2021).

---

[9] *See* https://www.facebook.com/groups/2280777962201435 (last visited August 12, 2024).

- "So this just happened today. Got of work hop in start her up and pop! Rear defrost wasn't on, today on my end it was a sunny day temperature was around 51. I guess I was riding a timing bomb 💣 🙅‍♂️. This was the 2nd replacement OE part" Raydar Jaysen Rayden, *Acura RDX/Aspec*, Facebook (Feb. 1, 2022).

- "This is ridiculous. I literally just had this happen to me yesterday." Latasha Holland, *Acura RDX/Aspec*, Facebook (Feb. 2, 2022).

- "I've also had mine replaced 3 times already." Kevin Troncoso, *Acura RDX/Aspec*, Facebook (Feb. 3, 2022).

- "My glass was done within 2 days, it's all the glass inside the trunk that rattles everytime I open it," Randy Duque, *Acura RDX/Aspec*, Facebook (Feb. 3, 2022).

- "I just got mine replaced yesterday unfortunately this was the second time this happened except this time I was driving []. It's not a glass issue because the first time I had to wait weeks for a replacement and was[] not willing to pay out of pocket got an after market glass and it still happen[e]d." Rios Syl, *Acura RDX/Aspec*, Facebook (Feb. 9, 2022).

- "Even tho it's covered at your dealership report it. @ https://www.nhtsa.gov/ and Acura customer service Some aren't getting it covered. It needs to be a recall! Just so you know people are having this happen more than once. It's happened to me" Sherry DiGirolamo, *Acura RDX/Aspec*, Facebook (Feb. 19, 2022).

- "My wife's 2020 RDX rear window just exploded. She got in the car--shut the door-- and boom window blew out. Is Acura covering this?" James Mower, *Acura RDX/Aspec*, Facebook (Feb. 20, 2022).

- "The same thing happen to me and I didn't even have my Acura RDX for a month. I called Acura they couldn't do anything . I called my insurance after 2 wks I finally got auto body shop remove the glass. They called it comprehensive loss." Edna Vega, *Acura RDX/Aspec*, Facebook (Mar. 25, 2022).

- "happened to my 2020 3 weeks ago" Vin Ortez, *Acura RDX/Aspec*, Facebook (Mar. 25, 2022).

- "Just go through safelite they'll fix it within a week im on my second window blowout lol but hey its under there lifetime warranty so why not" Tola Sok, *Acura RDX/Aspec*, Facebook (May 13, 2022).

**I.    Acknowledgements of the Problem by Honda Representatives, Dealers, and Technicians Alerted Defendant**

221.    Defendant's knowledge of the Defect is also shown by the fact that Honda representatives, dealers, and technicians have admitted to Vehicle owners—including many of the named Plaintiffs—that repeated rear hatch window failures is a well-known, common, and pervasive problem with the Vehicles.

222.    Defendant further acknowledged the Defect in its Service Bulletin, wherein it identified the cause for the Vehicles' rear windshield shattering: "[i]incorrect specification for the rear defroster grid." *See Acura Service Bulletin 22-014* (June 10, 2022), *supra* note 6; *see also* Exhibit D.

**J.    Tolling is Appropriate Because Defendant Fraudulently Concealed the Defect and Ignored Applicable Warranties**

223.    Defendant issued to all original purchasers and lessees, including Plaintiffs and the other Class members, a written manufacturer's warranty. This New Vehicle Limited Warranty states that "Acura will repair or replace any part that is defective in material or workmanship under normal use" and that "all repairs/replacements made under this warranty are free of charge."

224.    But, as countless consumers have reported, Defendant refused to repair the shattered rear hatch windows under its warranties and merely replaced the defective rear hatch windows with equally defective rear hatch windows.

225.    And, upon information and belief, Defendant marketed and sold, and continues to market and sell, the Vehicles with false and misleading representations and material omissions to the present day.

226.    Defendant knew or should have known that these representations and omissions were false and misleading, but nevertheless continued to make these in advertising, and concealed the fraud and the Defect to protect its reputation and financial interests.

227.    Class members who purchased or otherwise presented their Vehicles for repair outside of the applicable statute of limitations could not have discovered through the exercise of reasonable diligence that the Vehicles were defective and that Defendant was concealing the same.

228.    This is because the Defect is latent by nature because it is not obvious or ascertainable upon reasonable examination.

229.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to all claims set forth below. And all applicable statutes of limitation have also been tolled by Defendant's knowing and active fraudulent concealment of the facts alleged herein throughout the time period relevant to this action. Accordingly, all applicable statutes of limitations should be tolled and/or Defendant should be estopped from raising any such defenses.

## V.    CLASS ACTION ALLEGATIONS

230.    Plaintiffs bring this action on behalf of themselves and all others similarly situated under Federal Rule of Civil Procedure 23.

231.    Subject to confirmation, clarification, and/or modification based on discovery to be conducted in this action, the class that Plaintiffs seek to represent shall be defined as follows:

> All persons and entities nationwide that purchased a model year 2019-2023 Acura RDX Vehicle from Defendant through an authorized Acura dealership (the "Nationwide Class").

232.    Subject to confirmation, clarification, and/or modification based on discovery to be conducted in this action, Plaintiffs McIntyre and Bocek also seek to represent:

> All persons and entities nationwide that purchased a model year 2019-2023 Acura RDX Vehicle from Defendant through an authorized Acura dealership and who timely presented and were denied New Vehicle Limited Warranty coverage for the Defect (the "Nationwide Express Warranty Class")[10]

> All persons and entities in Alabama that purchased a model year 2019-2023 Acura RDX Vehicle from Defendant through an authorized Acura dealership and who timely presented and

---

[10] Plaintiffs McIntyre and Bocek seek to represent the Nationwide Express Warranty Class.

were denied New Vehicle Limited Warranty coverage for the Defect (the "Alabama Express Warranty Class")[11]

All persons and entities in Illinois that purchased a model year 2019-2023 Acura RDX Vehicle from Defendant through an authorized Acura dealership and who timely presented and were denied New Vehicle Limited Warranty coverage for the Defect (the "Illinois Express Warranty Class")[12]

233.    And, subject to confirmation, clarification, and/or modification based on discovery to be conducted in this action, Plaintiffs seek to represent the following state-specific classes, respectively:

i.     All persons and entities in Alabama that purchased a model year 2019-2023 Acura RDX Vehicle from Defendant through an authorized Acura dealership (the "Alabama Class").

ii.    All persons and entities in California that purchased a model year 2019-2023 Acura RDX Vehicle from Defendant through an authorized Acura dealership (the "California Class").

iii.   All persons and entities in Illinois that purchased a model year 2019-2023 Acura RDX Vehicle from Defendant through an authorized Acura dealership (the "Illinois Class").

iv.    All persons and entities in Kansas that purchased a model year 2019-2023 Acura RDX Vehicle from Defendant through an authorized Acura dealership (the "Kansas Class").

v.     All persons and entities in Maryland that purchased a model year 2019-2023 Acura RDX Vehicle from Defendant through an authorized Acura dealership (the "Maryland Class").

vi.    All persons and entities in Michigan that purchased a model year 2019-2023 Acura RDX Vehicle from Defendant through an authorized Acura dealership (the "Michigan Class")

vii.   All persons and entities in New Jersey that purchased a model year 2019-2023 Acura RDX Vehicle from Defendant through an authorized Acura dealership (the "New Jersey").

viii.  All persons and entities in Oregon that purchased a model year 2019-2023 Acura RDX Vehicle from Defendant through an authorized Acura dealership (the "Oregon Class").

ix.    All persons and entities in Pennsylvania that purchased a model year 2019-2023 Acura RDX Vehicle from Defendant through an authorized Acura dealership (the "Pennsylvania Class").

x.     All persons and entities in Texas that purchased a model year 2019-2023 Acura RDX Vehicle from Defendant through an authorized Acura dealership (the "Texas Class").

[11] Plaintiff McIntyre seeks to represent the Alabama Express Warranty Class.

[12] Plaintiff Bocek seeks to represent the Illinois Express Warranty Class.

xi.   All persons and entities in Washington that purchased a model year 2019-2023 Acura RDX Vehicle from Defendant through an authorized Acura dealership (the "Washington Class").

234.   The Nationwide Class, Nationwide Express Warranty Class, Alabama Express Warranty Class, Illinois Express Warranty Class, Alabama Class, California Class, Illinois Class, Kansas Class, Maryland Class, Michigan Class, New Jersey Class, Oregon Class, Pennsylvania Class, Texas Class, and Washington Class are collectively referred to herein as the "Classes," and their members are collectively referred to herein as "Class members."

235.   Excluded from the Classes are: (1) Defendant, any entity in which Defendant has a controlling interest, and its legal representatives, officers, directors, employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel.

236.   Plaintiffs seek only damages on behalf of themselves and the Class members. Plaintiffs disclaim any intent or right to seek any recovery in this action for personal injuries, wrongful death, or emotional distress suffered by Plaintiffs and/or the Class members.

237.   *Ascertainability.* While the exact number of Class members is unknown to Plaintiffs at this time and can only be determined by appropriate discovery, membership in the Classes is ascertainable based upon the records maintained by Honda and governmental officials.

238.   *Numerosity.* Upon information and belief, Honda has sold over 100,000 defective Vehicles nationwide during the relevant time period, all of which have the defective rear hatch windows at issue. Therefore, the Class members are so numerous that individual joinder of all Class members is impracticable under Federal Rule of Civil Procedure 23(a)(1).

239.   *Commonality and Predominance.* Defendant has engaged in the same conduct regarding all of the members of the Classes. The injuries and damages to these Class members also present questions of law and fact that are common to each Class member, and that are common to the Classes as a whole and will drive the litigation and predominate over any questions affecting only individual Class members. Numerous common issues of law and fact exist as to all Class members, including without limitation:

a.   whether each Vehicle was sold with a defective rear hatch window;

b.  whether Defendant breached express and implied warranties made to the Class members;

c.  whether Defendant replaced defective parts with defective parts;

d.  whether Defendant knew about the defect and, if so, how long Defendant has known about the Defect;

e.  whether Defendant concealed the Defect;

f.  whether Defendant's conduct violates state consumer protection statutes, warranty laws, and other laws asserted herein; and

g.  whether the Class members have suffered damages as a result of the conduct alleged herein, and, if so, the measure of such damages, including diminution of value and deprivation of the benefit of the bargain.

240.  *Typicality.* The claims, defenses, and injuries of the representative Plaintiffs are typical of the claims, defenses, and injuries of all those in the classes that they seek to respectively represent, and the claims, defenses, and injuries of each Class member are typical of those of all other members in their respective classes, because Plaintiffs and each Class member purchased a Vehicle with the same defective rear hatch window.

241.  *Adequacy.* Plaintiffs are all members of the Nationwide Class and will fairly and adequately represent and protect the interests of the Nationwide Class members as required by Federal Rule of Civil Procedure 23(a)(4). Plaintiffs are adequate representatives because their interests do not conflict with the interests of the Nationwide Class members. Further, Plaintiffs have retained counsel competent and experienced in complex class action litigation, including automotive defect class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiff McIntyre is a member of the Alabama Class, Plaintiff Regnier is a member of the California Class, Plaintiff Bocek is a member of the Illinois Class, Plaintiff Nienhueser is a member of the Kansas Class, Plaintiff Smith and Plaintiff Gross are members of the Maryland Class, Plaintiff Kroik is a member of the New Jersey Class, Plaintiff Collins is a member of the Oregon Class, Plaintiff Perrins is a member of the Pennsylvania Class, Plaintiff Null is a member of the Texas Class, and Plaintiff Bland is a member of the Washington Class, and, for the preceding reasons, they will fully and adequately represent the interests of their respective class members. Therefore, the interests of the Class members will be fairly and adequately protected.

242. *Superiority.* A class action is appropriate under Federal Rule of Civil Procedure 23(b)(3) because questions of law or fact common to Class members predominate over any questions affecting only individual members, and a class action is superior to any other available means for fairly and efficiently adjudicating the controversy. In this regard, the Class members' interests in individually controlling the prosecution of separate actions are low given the magnitude, burden, and expense of individual prosecutions against large corporations such as Defendant. Further, neither Plaintiffs nor their counsel are aware of any ongoing litigation concerning this controversy already begun by any of the Class members. It is desirable to concentrate this litigation in this forum to avoid burdening the courts with individual lawsuits. Individualized litigation presents a potential for inconsistent or contradictory results and also increases the delay and expense to all parties and the court system presented by the legal and factual issues of this case. By contrast, the class action procedure here will have no management difficulties. Defendant's records and the records available publicly will easily identify the Class members. This Defect is common to all defective Vehicles; therefore, the same common documents and testimony will be used to prove Plaintiffs' claims as well as the claims of the Class members. Finally, proceeding as a class action provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

**VI.    CLAIMS**

**COUNT I**
**BREACH OF IMPLIED WARRANTY—**
**MAGNUSON-MOSS WARRANTY ACT**
**(15 U.S.C. §§ 2301, *et seq.*)**
**On Behalf of the Nationwide Class**

[WITHDRAWN]

**COUNT II**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**On Behalf of the Nationwide Class**

243. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

244. Plaintiffs bring this claim on behalf of the Nationwide Class.

SECOND AMENDED CLASS ACTION COMPLAINT

- 54 -

245. Honda was at all relevant times a "merchant" with respect to motor vehicles and "seller" of motor vehicles.

246. The Vehicles are and were at all relevant times "goods."

247. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law.

248. The Vehicles were defective at the time they left the possession of Honda. The Vehicles were not in merchantable condition and are not fit for the ordinary purpose of providing safe and reliable transportation. Specifically, the Class Vehicles contain a rear windshield defect that render the Vehicles unsafe.

249. Thus, the Vehicles, when sold and at all times thereafter, were not in merchantable condition or quality and are not fit for their ordinary intended purpose.

250. By virtue of the conduct described herein and throughout this Complaint, Honda breached the implied warranty of merchantability.

251. Plaintiffs have afforded Honda a reasonable opportunity to cure the breach by providing Honda a pre-suit notice dated June 1, 2023, but Honda has not remedied the breach.

252. Any attempt by Honda to disclaim or limit the implied warranty of merchantability vis-à-vis consumers would be unconscionable and unenforceable because Honda knowingly sold a defective product without informing consumers about the defect. Any time limits contained in Honda's warranty periods would also be unconscionable and inadequate to protect Plaintiffs and the other Class members. Among other things, Plaintiffs and the other Class members had no meaningful choice in determining any time limitations, the terms of which unreasonably favored Honda. A gross disparity in bargaining power existed between Honda and Plaintiffs and the other Class members, and Honda knew of the Defect at the time of sale.

253. Privity exists because Defendant impliedly warranted to Plaintiffs and Class members through the warranting, website, Monroney sticker, advertising, marketing, and dealer agents that the Vehicles were high quality, reliable, and safe transportation, and by failing to make any mention of Defect.

254. Moreover, any privity requirement is satisfied because Plaintiffs and each Class member are intended third-party beneficiaries of contracts between Defendant and its authorized dealers that require the dealers to "expressly incorporate any warranty furnished by American Honda with a Honda Vehicle as a part of each order form or other contract for the sale of such Honda Vehicle by Dealer to any buyer." The authorized dealers were not intended to be the ultimate consumers of the Vehicles and have no rights under the warranties, which were designed for and intended to benefit consumers only such as Plaintiffs and Class members.

255. As a direct and proximate result of Honda's breach of the implied warranty of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial, including, but not limited to, benefit-of-the-bargain damages, restitution, and/or diminution of value.

**COUNT III**
**BREACH OF EXPRESS WARRANTY**
**MAGNUSON-MOSS WARRANTY ACT**
**(15 U.S.C. §§ 2301, ET SEQ.)**
**On Behalf of the Nationwide Express Warranty Class**

[WITHDRAWN]

**COUNT IV**
**BREACH OF EXPRESS WARRANTY**
**On Behalf of the Nationwide Express Warranty Class**

256. Plaintiffs McIntyre and Bocek ("Plaintiffs" for purposes of this Count) repeat and incorporate the allegations set forth above as if fully alleged herein.

257. Plaintiffs bring this Count on behalf of the Nationwide Class, the Alabama Class, and the Illinois Class (the "Classes" for purposes of this Count).

258. Honda is and was at all relevant times a merchant with respect to motor vehicles.

259. In the course of selling the defective Vehicles, Defendant expressly warranted in its New Vehicle Limited Warranty that it "will repair or replace any part that is defective in material or workmanship under normal use" and that "all repairs/replacements made under this warranty are free of charge."

260.    The New Vehicle Limited Warranty further provides that it does not cover "[b]roken, chipped, or scratched window glass unless it is due to a defect in material or workmanship." (emphasis added).

261.    Upon information and belief, Defendant's standard warranty language is identical for all defective Vehicles sold nationwide.

262.    Honda's warranty formed the basis of the bargain that was reached when Plaintiffs and other Class members purchased their Vehicles equipped with defective rear hatch windows from Honda.

263.    The Defect is a defect in material or workmanship and is accordingly covered by the New Vehicle Limited Warranty.

264.    Plaintiffs have attempted to have the rear hatch windows of their Vehicles repaired under the warranty.

265.    Defendant breached and continues to breach express warranties because Defendant refuses to repair the defective rear hatch windows under the New Vehicle Limited Warranty and cover the full expenses associated with repairing and/or replacing the defective rear hatch windows in Plaintiffs' and the Class members' defective Vehicles.

266.    Defendant also fraudulently concealed material information from Plaintiffs and the Class regarding the existence and extent of the Defect. Therefore, any limitations imposed by Defendant as to the scope of its obligations under the express warranties to repair and replace defective parts and/or any disclaimers in the written warranties prepared by Defendant that purport to preclude recovery by Plaintiffs or the Class members are unconscionable, both substantively and procedurally, and are unenforceable as a matter of law.

267.    Any such limitations or exclusions have been imposed unilaterally by Defendant via adhesive, "take it or leave it" contracts with no ability by Plaintiffs or the Class members to negotiate the substance or coverage of the warranties, and Plaintiffs and the Class members did not have any meaningful choices of reasonably available alternative sources of supply of suitable Vehicles free of the above unconscionable conditions.

268. Furthermore, Defendant's express warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the Class members whole and because Defendant has failed and/or refused to adequately provide the promised remedies within a reasonable time.

269. Further, the enforcement under these circumstances of any limitations whatsoever on the recovery of incidental and/or consequential damages is barred because any such limitations work to reallocate the risks between the parties in an unconscionable and objectively unreasonable manner, and result in overly harsh or one-sided results that shock the conscience.

270. Moreover, many of the damages flowing from the Defect in the Vehicles cannot be resolved by the limited remedies contained in the express warranty as those incidental and consequential damages have already been suffered due to Defendant's fraudulent conduct as alleged herein and due to their failure to provide such limited remedy within a reasonable time. Therefore, any limitation on Plaintiffs' and the Class members' remedies would cause the available remedy to be insufficient to make them whole.

271. Plaintiffs and the Class members have suffered damages directly and proximately caused by Defendant's breach of the express warranty and are entitled to recover damages including, but not limited to, out of pocket expenses and diminution of value.

## COUNT V
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (BASED ON ALABAMA LAW)
## On Behalf of the Alabama Class

272. Plaintiff McIntyre ("Plaintiff" for purposes of this Count) incorporates by reference all preceding allegations as though fully set forth herein.

273. Plaintiff brings this claim on behalf of the Alabama Class and in the alternative to Count II.

274. Honda was at all relevant times a "merchant" with respect to motor vehicles and "seller" of motor vehicles.

275. The Vehicles are and were at all relevant times "goods."

276. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ala. Code § 7-2-314.

277. The Vehicles were defective at the time they left the possession of Honda. The Vehicles were not in merchantable condition and are not fit for the ordinary purpose of providing safe and reliable transportation. Specifically, the Class Vehicles contain a Defect that renders the Vehicles unsafe.

278. Thus, the Vehicles, when sold and at all times thereafter, were not in merchantable condition or quality and are not fit for their ordinary intended purpose.

279. By virtue of the conduct described herein and throughout this Complaint, Honda breached the implied warranty of merchantability.

280. Plaintiff has afforded Honda a reasonable opportunity to cure the breach by providing Honda a pre-suit notice dated June 1, 2023, but Honda has not remedied the breach.

281. Any attempt by Honda to disclaim or limit the implied warranty of merchantability vis-à-vis consumers would be unconscionable and unenforceable because Honda knowingly sold a defective product without informing consumers about the Defect. Any time limits contained in Honda's warranty periods would also be unconscionable and inadequate to protect Plaintiff and the other Alabama Class members. Among other things, Plaintiff and the other Alabama Class members had no meaningful choice in determining any time limitations, the terms of which unreasonably favored Honda. A gross disparity in bargaining power existed between Honda and Plaintiff and the other Alabama Class members, and Honda knew of the Defect at the time of sale.

282. Privity exists because Defendant impliedly warranted to Plaintiff and Class members through the warranting, website, Monroney sticker, advertising, marketing, and dealer agents that the Vehicles were high quality, reliable, and safe transportation, and by failing to make any mention of Defect.

283. Moreover, any privity requirement is satisfied because Plaintiff and each Class member are intended third-party beneficiaries of contracts between Defendant and its authorized dealers that require the dealers to "expressly incorporate any warranty furnished by American Honda with a Honda

Vehicle as a part of each order form or other contract for the sale of such Honda Vehicle by Dealer to any buyer." The authorized dealers were not intended to be the ultimate consumers of the Vehicles and have no rights under the warranties, which were designed for and intended to benefit consumers only such as Plaintiff and Class members.

284. As a direct and proximate result of Honda's breach of the implied warranty of merchantability, Plaintiff and the other Alabama Class members have been damaged in an amount to be proven at trial, including, but not limited to, benefit-of-the-bargain damages, restitution, and/or diminution of value.

## COUNT VI
## BREACH OF EXPRESS WARRANTY
## (BASED ON ALABAMA LAW)
### On Behalf of the Alabama Express Warranty Class

285. Plaintiffs McIntyre ("Plaintiff" for purposes of this Count) repeats and incorporates the allegations set forth above as if fully alleged herein.

286. Plaintiff brings this Count on behalf of the Alabama Express Warranty Class. (the "Class" for purposes of this Count).

287. Honda is and was at all relevant times a merchant with respect to motor vehicles.

288. In the course of selling the defective Vehicles, Defendant expressly warranted in its New Vehicle Limited Warranty that it "will repair or replace any part that is defective in material or workmanship under normal use" and that "all repairs/replacements made under this warranty are free of charge."

289. The New Vehicle Limited Warranty further provides that it does not cover "[b]roken, chipped, or scratched window glass unless it is due to a defect in material or workmanship."

290. Upon information and belief, Defendant's standard warranty language is identical for all defective Vehicles sold nationwide.

291. The Defect is a defect in material or workmanship and is accordingly covered by the New Vehicle Limited Warranty.

292. Plaintiff has attempted to have the rear windshield of his Vehicles repaired under the warranty.

293. Defendant breached and continues to breach express warranties because Defendant refuses to repair the defective rear windshields under the New Vehicle Limited Warranty and cover the full expenses associated with repairing and/or replacing the defective rear windshields in Plaintiff's and the Class members' defective Vehicles.

294. Defendant also fraudulently concealed material information from Plaintiff and the Class regarding the existence and extent of the Defect. Therefore, any limitations imposed by Defendant as to the scope of its obligations under the express warranties to repair and replace defective parts and/or any disclaimers in the written warranties prepared by Defendant that purport to preclude recovery by Plaintiff or the Class members are unconscionable, both substantively and procedurally, and are unenforceable as a matter of law.

295. Any such limitations or exclusions have been imposed unilaterally by Defendant via adhesive, "take it or leave it" contracts with no ability by Plaintiff or the Class members to negotiate the substance or coverage of the warranties, and Plaintiff and the Class members did not have any meaningful choices of reasonably available alternative sources of supply of suitable Vehicles free of the above unconscionable conditions.

296. Furthermore, Defendant's express warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the Class members whole and because Defendant has failed and/or refused to adequately provide the promised remedies within a reasonable time.

297. Further, the enforcement under these circumstances of any limitations whatsoever on the recovery of incidental and/or consequential damages is barred because any such limitations work to reallocate the risks between the parties in an unconscionable and objectively unreasonable manner, and result in overly harsh or one-sided results that shock the conscience.

298. Moreover, many of the damages flowing from the Vehicles cannot be resolved by the limited remedies contained in the express warranty as those incidental and consequential damages have already been suffered due to Defendant's fraudulent conduct as alleged herein and due to their failure

to provide such limited remedy within a reasonable time. Therefore, any limitation on Plaintiff's and the Class members' remedies would cause the available remedy to be insufficient to make them whole.

299.    Plaintiff and the Class members have suffered damages directly and proximately caused by Defendant's breach of the express warranty and are entitled to recover damages including, but not limited to, out of pocket expenses and diminution of value.

**COUNT VII**
**VIOLATIONS OF THE ALABAMA DECEPTIVE TRADE PRACTICES ACT**
**(ALA. CODE § 8-19-1, *et seq.*)**
**On Behalf of the Alabama Class**

300.    Plaintiff McIntyre ("Plaintiff" for purposes of this Count) incorporates by reference all preceding allegations as though fully set forth herein.

301.    Plaintiff brings this Count on behalf of the Alabama Class.

302.    By failing to release material facts about the Defect, Honda curtailed or reduced the ability of consumers to take notice of material facts about their Vehicle, and/or it affirmatively operated to hide or keep those facts from consumers. Moreover, Honda has otherwise engaged in activities with a tendency or capacity to deceive.

303.    By failing to disclose and by actively concealing the Defect in the rear windshield and marketing its Vehicles as safe, reliable, and of high quality, Honda engaged in deceptive trade practices in violation of the Alabama's Deceptive Trade Practices Act.

304.    In the course of Honda's business, it willfully failed to disclose and actively concealed the Defect as discussed herein. Honda compounded the deception by repeatedly asserting the Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety, and stood behind its vehicles once they are on the road.

305.    Honda's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, and did in fact deceive reasonable consumers, including Plaintiff and the other Alabama Class members.

306.    Honda intentionally and knowingly misrepresented material facts regarding the Vehicles with an intent to mislead Plaintiff and the other Alabama Class members, including without

limitation by failing to disclose the Defect in light of circumstances under which the omitted facts were necessary in order to correct the assumptions, inferences or representations being made by Honda about the reliability and safety of its Vehicles.

307. Honda's conduct as alleged above constitutes unfair or deceptive acts or practices in violation of Alabama's Deceptive Trade Practices Act for, *inter alia*, one or more of the following reasons:

a) representing that the Vehicles have sponsorship, approval, characteristics, benefits, and qualities that they do not have;

b) representing that the Vehicles are of a particular standard, quality, or grade when they are not;

c) advertising the Vehicles with intent not to sell them as advertised including but not limited to selling the Vehicles with the known Defect at issue in this litigation; and

d) knowingly making false and misleading statements of fact concerning selling the Vehicles with the known Defect at issue in this litigation.

308. Honda's actions as alleged above occurred in the conduct of trade or commerce.

309. Honda's unfair or deceptive actions impact the public interest because Plaintiff and the Alabama Class were injured in exactly the same way as many others purchasing Vehicles in Alabama, as a result of Honda's generalized course of deception. All of the conduct alleged herein occurred, and continues to occur, in the conduct of Honda's business.

310. Plaintiff and the Alabama Class were injured as a result of Honda's conduct as described above, including but not limited to diminution of value.

311. Honda's conduct proximately caused the injuries to Plaintiff and the Alabama Class.

312. Accordingly, Honda is liable to Plaintiff and the Alabama Class for damages in an amount to be proven at trial, including attorneys' fees, costs, and treble damages.

**COUNT VIII**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(BASED ON CALIFORNIA LAW)**
**On Behalf of the California Class**

313. Plaintiff Regnier ("Plaintiff" for purposes of this Count) incorporates by reference all preceding allegations as though fully set forth herein.

314.    Plaintiff brings this Count on behalf of the California Class and in the alternative to Count II.

315.    Honda was at all relevant times a "merchant" with respect to motor vehicles and "seller" of motor vehicles.

316.    The Vehicles are and were at all relevant times "goods."

317.    A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Cal. Com. Code § 2314.

318.    The Vehicles were defective at the time they left the possession of Honda. The Vehicles were not in merchantable condition and are not fit for the ordinary purpose of providing safe and reliable transportation. Specifically, the Class Vehicles contain a Defect that renders the Vehicles unsafe.

319.    Thus, the Vehicles, when sold and at all times thereafter, were not in merchantable condition or quality and are not fit for their ordinary intended purpose.

320.    By virtue of the conduct described herein and throughout this Complaint, Honda breached the implied warranty of merchantability.

321.    Plaintiff has afforded Honda a reasonable opportunity to cure the breach by providing Honda a pre-suit notice dated June 1, 2023, but Honda has not remedied the breach.

322.    Any attempt by Honda to disclaim or limit the implied warranty of merchantability vis-à-vis consumers would be unconscionable and unenforceable because Honda knowingly sold a defective product without informing consumers about the Defect. Any time limits contained in Honda's warranty periods would also be unconscionable and inadequate to protect Plaintiff and the other California Class members. Among other things, Plaintiff and the other California Class members had no meaningful choice in determining any time limitations, the terms of which unreasonably favored Honda. A gross disparity in bargaining power existed between Honda and Plaintiff and the other California Class members, and Honda knew of the Defect at the time of sale.

323.    Privity exists because Defendant impliedly warranted to Plaintiff and Class members through the warranting, website, Monroney sticker, advertising, marketing, and dealer agents that the

Vehicles were high quality, reliable, and safe transportation, and by failing to make any mention of Defect.

324.    Moreover, any privity requirement is satisfied because Plaintiff and each Class member are intended third-party beneficiaries of contracts between Defendant and its authorized dealers that require the dealers to "expressly incorporate any warranty furnished by American Honda with a Honda Vehicle as a part of each order form or other contract for the sale of such Honda Vehicle by Dealer to any buyer." The authorized dealers were not intended to be the ultimate consumers of the Vehicles and have no rights under the warranties, which were designed for and intended to benefit consumers only such a Plaintiff and Class members.

325.    As a direct and proximate result of Honda's breach of the implied warranty of merchantability, Plaintiff and the other California Class members have been damaged in an amount to be proven at trial, including, but not limited to, benefit-of-the-bargain damages, restitution, and/or diminution of value.

**COUNT IX**
**VIOLATION OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT ("CLRA")**
**(CAL. CIV. CODE §§ 1750, *et seq.*)**
**On Behalf of the California Class**

326.    Plaintiff Christina Regnier re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

327.    Plaintiff Regnier brings this claim individually and on behalf of the members of the putative California Class against Defendant.

328.    This cause of action is brought pursuant to California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750-1785 (the "CLRA").

329.    Plaintiff Regnier and the other members of the California Class are "consumers," as the term is defined by California Civil Code § 1761(d).

330.    Plaintiff Regnier and the other members of the California Class, and Defendant has engaged in "transactions," as the term is defined by California Civil Code § 1761(e).

331.    At all relevant times, Defendant was a "person" as defined by Cal. Civ. Code § 1761(c).

332.    By the acts and conduct alleged herein, Defendant engaged in deceptive, unfair, and misleading acts and practices by failing to disclose and by actively concealing the Defect in the rear windshield and marketing its Vehicles as safe, reliable, and of high quality.

333.    By failing to release material facts about the Defect, Defendant curtailed or reduced the ability of consumers to take notice of material facts about their Vehicle, and/or it affirmatively operated to hide or keep those facts from consumers. Moreover, Defendant has otherwise engaged in activities with a tendency or capacity to deceive.

334.    In the course of Defendant's business, it willfully failed to disclose and actively concealed the Defect as discussed herein. Defendant compounded the deception by repeatedly asserting the Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety, and stood behind its vehicles once they are on the road.

335.    As a result of the conduct described herein, Defendant has engaged in unfair and deceptive sales practices in violation of the CLRA, to wit:

a)    Defendant, by failing to disclose and actively concealing the Defect, and marketing its Vehicles as safe, reliable, and of high quality as discussed herein, was thus representing that its goods had characteristics, uses, and/or benefits that they did not have, which is a violation of CLRA §1770(a)(5);

b)    Defendant, by failing to disclose and actively concealing the Defect, and marketing its Vehicles as safe, reliable, and of high quality as discussed herein, was thus representing that the Vehicles were of a particular standard or quality, when they are of another, which is a violation of CLRA §1770(a)(7); and

c)    Defendant, by failing to disclose and actively concealing the Defect, and marketing its Vehicles as safe, reliable, and of high quality as discussed herein, was thus advertising goods or services with intent not to sell them as advertised, which is a violation of CLRA §1770(a)(9).

336.    Because Plaintiff Regnier and the California Class members purchased the Vehicles in substantial part based on Defendant's representations and omissions, Plaintiff Regnier and the

California Class Members spent money that they otherwise would not have spent and have been injured as a result.

337.    Plaintiff Regnier and the California Class members are reasonable consumers who expected that Defendant would not sell vehicles with known safety defects, such as the defective rear hatch window, and will disclose any such defects to its consumers when it learns of them.

338.    As a result of Defendant's conduct and unfair or deceptive acts or practices, Plaintiff Regnier and the California Class members suffered actual damages in that the Products are not as advertised and are not worth the amount paid, and Defendant has deprived Plaintiff Regnier and the California Class members of the benefit of their bargain.

339.    Pursuant to Cal. Civ. Code § 1782, Plaintiff Regnier's counsel sent notification, a true and correct copy of which is attached as Exhibit E, to Defendant in writing by certified mail on June 1, 2023 of its violations of § 1770 described above and demanded, *inter alia*, that it rectify the damage caused by its unlawful, unfair, and deceptive trade practices and warranty breaches related to the Defect.

340.    Pursuant to Section 1780(d) of the Act, attached hereto as Exhibit F is an affidavit of Plaintiff Regnier showing that this action has been commenced in the proper forum.

341.    Plaintiff Regnier and the California Class members seek and an award of attorneys' fees and costs under Cal. Civ. Code § 1780(e).

342.    The notice period having run since Plaintiff Regnier's counsel previously sent notification as required by the CLRA, Plaintiff Regnier also seeks restitution and actual, statutory, and punitive damages as appropriate because Defendant has not rectified the notified issues within 30 days of the date of written notice pursuant to Section 1782 of the Act.

343.    As a direct and proximate result of Defendant's violations, Plaintiff Regnier and the California Class members have suffered injury in fact in an amount to be established at trial. Through

SECOND AMENDED CLASS ACTION COMPLAINT
- 67 -

its unlawful acts and practices, Defendant has obtained, and continues to unfairly obtain, money from members of the California Class.

344. Therefore, Plaintiff Regnier, on behalf of the California Class, seeks all damages permitted by the CLRA including restitution, compensatory damages, statutory damages, punitive damages in an amount adequate to deter such conduct in the future, and attorneys' fees.

## COUNT X
## VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL")
### (CAL. BUS. & PROF. CODE §§ 17200, *et seq.*)
### On Behalf of the California Class

### [WITHDRAWN]

.

## COUNT XI
## VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW ("FAL")
### (CAL. BUS. & PROF. CODE §§ 17500, *et seq.*)
### On Behalf of the California Class

345. Plaintiff Christina Regnier re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

346. Plaintiff Regnier brings this claim individually and on behalf of the members of the California Class against Defendant.

347. Defendant's acts alleged herein violate California Business and Professions Code § 17500. Defendant acted knowingly, recklessly, and in conscious disregard of the true facts in perpetuating their deceptive advertising scheme and causing injuries to Plaintiff Regnier and the putative California Class.

348. By the acts and conduct alleged herein, Defendant engaged in deceptive, false, unfair, unlawful, and misleading acts and practices by failing to disclose and by actively concealing the Defect in the rear windshield and marketing its Vehicles as safe, reliable, and of high quality.

349. By failing to release material facts about the Defect, Defendant curtailed or reduced the ability of consumers to take notice of material facts about their Vehicle, and/or it affirmatively operated to hide or keep those facts from consumers. Moreover, Defendant has otherwise engaged in activities with a tendency or capacity to deceive.

350. In the course of Defendant's business, it willfully failed to disclose and actively concealed the Defect as discussed herein. Defendant compounded the deception by repeatedly asserting the Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety, and stood behind its vehicles once they are on the road.

351. Plaintiff Regnier and the California Class members have suffered an injury in fact resulting in the loss of money as a result of Defendant's conduct as described above, including but not limited to diminution of value. Because Plaintiff Regnier and the California Class members purchased the Vehicles in part based on Defendant's representations and omissions, Plaintiff Regnier and the California Class members spent money that they otherwise would not have spent and have been injured as a result.

352. As a result of Defendant's false and misleading practices, misrepresentations, and omissions, Plaintiff Regnier and the California Class members have been injured in amounts not yet ascertained, but which are believed to exceed the hundreds of thousands, or millions, of dollars in the aggregate.

## COUNT XII
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (BASED ON ILLINOIS LAW)
### On Behalf of the Illinois Class

353. Plaintiff Bocek ("Plaintiff" for purposes of this Count) incorporates by reference all preceding allegations as though fully set forth herein.

354. Plaintiff brings this claim on behalf of the Illinois Class and in the alternative to Count II.

355. Honda was at all relevant times a "merchant" with respect to motor vehicles under 810 ILCS §§ 5/2-104(1) and 5/2A-103(3), and "sellers" of motor vehicles under § 5/2-103(1)(d).

356. The Vehicles are and were at all relevant times "goods" within the meaning of 810 ILCS §§ 5/2-105(1) and 5/2A-103(1)(h).

357. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ill. Code §§ 5/2-314 and 28-12-212.

358. The Vehicles were defective at the time they left the possession of Honda. The Vehicles were not in merchantable condition and are not fit for the ordinary purpose of providing safe and reliable transportation. Specifically, the Class Vehicles contain a Defect that renders the Vehicles unsafe.

359. Thus, the Vehicles, when sold and at all times thereafter, were not in merchantable condition or quality and are not fit for their ordinary intended purpose.

360. By virtue of the conduct described herein and throughout this Complaint, Honda breached the implied warranty of merchantability.

361. Honda knew about the Defect at the time of the purchase, allowing it to cure its breach of warranty if it chose.

362. Honda was provided notice of these issues by implosion incidents at its own factory (per the anonymous complaint outlined above), as well as numerous complaints against it, including the instant Complaint, and by customer complaints, letters, emails, and other communications from Class members and from dealers and other repair facilities.

363. Certain Plaintiffs also afforded Honda a reasonable opportunity to cure the breach by providing Honda a pre-suit notice dated June 1, 2023. But Honda has not cured the breach.

364. Any attempt by Honda to disclaim or limit the implied warranty of merchantability vis-à-vis consumers would be unconscionable and unenforceable because Honda knowingly sold a defective product without informing consumers about the Defect. Any time limits contained in Honda's warranty periods would also be unconscionable and inadequate to protect Plaintiff and the other Illinois Class members. Among other things, Plaintiff and the other Illinois Class members had

no meaningful choice in determining any time limitations, the terms of which unreasonably favored Honda. A gross disparity in bargaining power existed between Honda and Plaintiff and the other Illinois Class members, and Honda knew of the Defect at the time of sale.

365. Privity exists because Defendant impliedly warranted to Plaintiff and Class members through the warranting, website, Monroney sticker, advertising, marketing, and dealer agents that the Vehicles were high quality, reliable, and safe transportation, and by failing to make any mention of Defect.

366. Defendant markets its Vehicles directly to consumers and maintains a direct relationship with purchasers. Defendant's authorized dealers and service professionals are agents of Defendant and their participation in the sale, maintenance, and repair of Vehicles at the direction and under the supervision of Defendant does not interrupt the direct relationship between Defendant and consumers. Plaintiff and Class members purchased their Vehicles directly from Defendant through Defendant's actual or apparent agents.

367. Moreover, any privity requirement is satisfied because Plaintiff and each Class member are intended third-party beneficiaries of contracts between Defendant and its authorized dealers that require the dealers to "expressly incorporate any warranty furnished by American Honda with a Honda Vehicle as a part of each order form or other contract for the sale of such Honda Vehicle by Dealer to any buyer."  The authorized dealers were not intended to be the ultimate consumers of the Vehicles and have no rights under the warranties, which were designed for and intended to benefit consumers only such as Plaintiff and Class members.

368. As a direct and proximate result of Honda's breach of the implied warranty of merchantability, Plaintiff and the other Illinois Class members have been damaged in an amount to be proven at trial, including, but not limited to, benefit-of-the-bargain damages, restitution, and/or diminution of value.

**COUNT XIII**
**BREACH OF EXPRESS WARRANTY**
**(BASED ON ILLINOIS LAW)**
**On Behalf of the Illinois Express Warranty Class**

369.    Plaintiff Bocek ("Plaintiff" for purposes of this Count) repeats and incorporates the allegations set forth above as if fully alleged herein.

370.    Plaintiff brings this Count on behalf of the Illinois Express Warranty Class (the "Class" for purposes of this Count).

371.    Honda is and was at all relevant times a merchant with respect to motor vehicles.

372.    In the course of selling the defective Vehicles, Defendant expressly warranted in its New Vehicle Limited Warranty that it "will repair or replace any part that is defective in material or workmanship under normal use" and that "all repairs/replacements made under this warranty are free of charge."

373.    The New Vehicle Limited Warranty further provides that it does not cover "[b]roken, chipped, or scratched window glass unless it is due to a defect in material or workmanship."

374.    Upon information and belief, Defendant's standard warranty language is identical for all defective Vehicles sold in Illinois.

375.    The Defect is a defect in material or workmanship and is accordingly covered by the New Vehicle Limited Warranty.

376.    Plaintiff has attempted to have the rear windshield of her Vehicle repaired under the warranty.

377.    Defendant breached and continues to breach express warranties because Defendant refuses to repair the defective rear windshields under the New Vehicle Limited Warranty and cover the full expenses associated with repairing and/or replacing the defective rear windshields in Plaintiff's and the Class members' defective Vehicles.

378.    Defendant also fraudulently concealed material information from Plaintiffs and the Class regarding the existence and extent of the Defect. Therefore, any limitations imposed by Defendant as to the scope of its obligations under the express warranties to repair and replace defective parts and/or any disclaimers in the written warranties prepared by Defendant that purport to preclude

recovery by Plaintiff or the Class members are unconscionable, both substantively and procedurally, and are unenforceable as a matter of law

379.    Any such limitations or exclusions have been imposed unilaterally by Defendant via adhesive, "take it or leave it" contracts with no ability by Plaintiff or the Class members to negotiate the substance or coverage of the warranties, and Plaintiff and the Class members did not have any meaningful choices of reasonably available alternative sources of supply of suitable Vehicles free of the above unconscionable conditions.

380.    Furthermore, Defendant's express warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the Class members whole and because Defendant has failed and/or refused to adequately provide the promised remedies within a reasonable time.

381.    Further, the enforcement under these circumstances of any limitations whatsoever on the recovery of incidental and/or consequential damages is barred because any such limitations work to reallocate the risks between the parties in an unconscionable and objectively unreasonable manner, and result in overly harsh or one-sided results that shock the conscience.

382.    Moreover, many of the damages flowing from the Vehicles cannot be resolved by the limited remedies contained in the express warranty as those incidental and consequential damages have already been suffered due to Defendant's fraudulent conduct as alleged herein and due to their failure to provide such limited remedy within a reasonable time. Therefore, any limitation on Plaintiff's and the Class members' remedies would cause the available remedy to be insufficient to make them whole.

383.    Plaintiff and the Class members have suffered damages directly and proximately caused by Defendant's breach of the express warranty and are entitled to recover damages including, but not limited to, out of pocket expenses and diminution of value.

**COUNT XIV**
**ILLIINOIS CONSUMER FRAUD AND DECEPTIBE BUSINESS PRACTICES ACT**
**(815 ILL. COMP. STAT. 505/1, ET SEQ.)**
**On Behalf of Illinois Class**

384.    Plaintiff Nancy Bocek ("Plaintiff" for purposes of this Count) incorporates by reference all preceding allegations as though fully set forth herein.

385.    Plaintiff brings this claim on behalf of the Illinois Class.

386.    At all times relevant hereto, Plaintiff Bocek, the Illinois Class members, and Honda were either natural persons or their legal representatives, partnerships, corporations, companies, trusts, business entities, or associations. 815 Ill. Comp. Stat. 505/1(c).

387.    Plaintiff and Illinois Class members are also "consumers" as that term is defined in 815 ILCS 505/1(e).

388.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") prohibits "unfair or deceptive acts or practices, including, but not limited to, the use of employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived, or damaged thereby." 815 ILCS 505/2.

389.    Under the ICFA, "trade" or "commerce" is the "advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this State." 815 Ill. Comp. Stat. 505/1(f).

390.    At all times relevant hereto, Honda engaged in the advertising, offering for sale, sale, and/or distribution of property.

391.    Plaintiff and the Illinois Class members purchased the Vehicles at issue herein for their use or that of members of their households.

392.    Honda, by and through its employees, agents, and/or servants, engaged in unlawful schemes, courses of conduct, and deceptive practices with regard to the sale and marketing of its Vehicles by concealing, failing to release, and omitting material facts about the dangers and risks posed

by the Defect. Honda had an ongoing duty to Plaintiffs and the Illinois Class to refrain from unfair and deceptive practices under the ICFA in the course of its business.

393. The Defect constitutes a safety issue that Honda should have disclosed because it was in a superior position to know the true facts related to the Defect, and Plaintiff and members of the Illinois Class could not reasonably be expected to learn or discover the true facts related to this Defect. Honda, by the conduct, statements, and omissions described above, also knowingly and intentionally concealed from Plaintiff and the Illinois Class that the Vehicles suffered from the Defect (and the costs, safety risks, and diminished value of the Vehicles as a result of the Defect).

394. Honda failed to release material facts about the Defect and curtailed or reduced the ability of consumers to take notice of material facts about their Vehicle, and/or affirmatively operated to hide or keep those facts from consumers.

395. In the course of Honda's business, and its representations made to Plaintiff and the Illinois Class members, it willfully failed to disclose and actively concealed the Defect as discussed herein. Honda compounded the deception by repeatedly representing that the Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety, and stood behind its vehicles once they are on the road.

396. Honda intended that Plaintiff and the Class members would rely on their concealment and omission of material facts, including without limitation by failing to disclose the Defect in light of circumstances under which the omitted facts were necessary in order to correct the representations being made by Honda about the reliability and safety of its Vehicles.

397. By failing to disclose and by knowingly and intentionally concealing from Plaintiff and the Illinois Class that the Vehicles suffered from the Defect (and the costs, safety risk, and diminished value of the Vehicles as a result of the Defect) and marketing and representing that its Vehicles were safe, reliable, and of high quality, Honda violated the ICFA and caused injuries to Plaintiff and the Illinois Class members. The omissions and acts of concealment by Honda pertained to information that was material to Plaintiff and members of the Illinois Class, as it would have been to all reasonable consumers.

398. Honda's misconduct, including its misrepresentations and omission of material facts alleged herein, took place in connection with Honda's course of trade or commerce in Illinois, arose out of transactions that occurred in Illinois, and/or harmed individuals located in Illinois.

399. To this day, Honda continues to violate the ICFA by actively concealing the material information about the Vehicles and the Defect and by representing to Plaintiff and members of the Class that the Vehicles are defect-free and safe.

400. As a direct and proximate cause of Honda's concealments, misrepresentations, and/or failure to disclose material information, Plaintiff and the Illinois Class suffered ascertainable loss and actual damages, in the form of out-of-pocket costs incurred to repair and/or replace their defective rear windshields in the Vehicles. Further, Plaintiff and the Illinois Class members did not receive the benefit of their bargain as a result of Honda's misconduct. Indeed, had Honda disclosed the Defect or had Plaintiff and the Illinois Class members been aware of the Defect in the rear windshield of the Vehicles, Plaintiff and the Illinois Class members either would have paid less for the Vehicles, they would not have purchased the Vehicles, or would have avoided the extensive repair costs associated therewith.

401. Plaintiff and the Illinois Class members seek all damages permitted by law including monetary relief against Honda in the amount of actual damages, incidental and consequential damages, punitive damages in an amount adequate to deter such conduct in the future because Honda acted with fraud and/or malice and/or was grossly negligent, prejudgment interest, attorneys' fees, and all other relief available under 815 ILCS 505/1, et seq.

**COUNT XV**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**(BASED ON KANSAS LAW)**
**On Behalf of the Kansas Class**

402. Plaintiff Nienhueser ("Plaintiff" for purposes of this Count) incorporates by reference all preceding allegations as though fully set forth herein.

403. Plaintiff brings this claim on behalf of the Kansas Class and in the alternative to Count II.

404.    Honda was at all relevant times a "merchant" with respect to motor vehicles and a "seller" of motor vehicles. As such, Plaintiff's Vehicle and the Vehicles of Kansas Class Members were goods warranted by Honda to be merchantable pursuant to K.S.A. 84-2-314.

405.    The Vehicles are and were at all relevant times "goods."

406.    A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which Vehicles are used is implied by law pursuant to K.S.A. 84-2-314(2)(c).

407.    The Vehicles were defective at the time they left the possession of Honda. The Vehicles were not in merchantable condition and are not fit for the ordinary purpose of providing safe and reliable transportation. Specifically, the Class Vehicles contain a Defect that renders the Vehicles unsafe.

408.    Thus, the Vehicles, when sold and at all times thereafter, were not in merchantable condition or quality and are not fit for their ordinary intended purpose.

409.    By virtue of the conduct described herein and throughout this Complaint, Honda breached the implied warranty of merchantability.

410.    Plaintiff has afforded Honda a reasonable opportunity to cure the breach by providing Honda a pre-suit notice dated June 1, 2023, but Honda has not remedied the breach.

411.    Any attempt by Honda to disclaim or limit the implied warranty of merchantability vis-à-vis consumers would be unconscionable and unenforceable because Honda knowingly sold a defective product without informing consumers about the defect. Any time limits contained in Honda's warranty periods would also be unconscionable and inadequate to protect Plaintiff and the other Kansas Class members. Among other things, Plaintiff and the other Kansas Class members had no meaningful choice in determining any time limitations, the terms of which unreasonably favored Honda. A gross disparity in bargaining power existed between Honda and Plaintiff and the other Kansas Class members, and Honda knew of the Defect at the time of sale.

412.    As a direct and proximate result of Honda's breach of the implied warranty of merchantability, Plaintiff and the other Kansas Class members have been damaged in an amount to be

proven at trial, including, but not limited to, benefit-of-the-bargain damages, restitution, and/or diminution of value.

**COUNT XVI**
**VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT**
**(K.S.A. 50-626)**
**On Behalf of the Kansas Class**

[WITHDRAWN]

**COUNT XVII**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**(BASED ON MARYLAND LAW)**
**On Behalf of the Maryland Class**

413.    Plaintiff Smith ("Plaintiff" for purposes of this Count) incorporates by reference all preceding allegations as though fully set forth herein.

414.    Plaintiff brings this claim on behalf of the Maryland Class and in the alternative to Count II.

415.    Honda was at all relevant times a "merchant" with respect to motor vehicles and "seller" of motor vehicles.

416.    The Vehicles are and were at all relevant times "goods."

417.    A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Md. Code Com. Law § 2-314.

418.    The Vehicles were defective at the time they left the possession of Honda. The Vehicles were not in merchantable condition and are not fit for the ordinary purpose of providing safe and reliable transportation. Specifically, the Class Vehicles contain a Defect that renders the Vehicles unsafe.

419.    Thus, the Vehicles, when sold and at all times thereafter, were not in merchantable condition or quality and are not fit for their ordinary intended purpose.

420.    By virtue of the conduct described herein and throughout this Complaint, Honda breached the implied warranty of merchantability.

421.    Plaintiff has afforded Honda a reasonable opportunity to cure the breach by providing Honda a pre-suit notice dated June 1, 2023 (see Exhibit E), but Honda has not remedied the breach.

422.    Any attempt by Honda to disclaim or limit the implied warranty of merchantability vis-à-vis consumers would be unconscionable and unenforceable because Honda knowingly sold a defective product without informing consumers about the defect. Any time limits contained in Honda's warranty periods would also be unconscionable and inadequate to protect Plaintiff and the other Maryland Class members. Among other things, Plaintiff and the other Maryland Class members had no meaningful choice in determining any time limitations, the terms of which unreasonably favored Honda. A gross disparity in bargaining power existed between Honda and Plaintiff and the other Maryland Class members, and Honda knew of the Defect at the time of sale.

423.    As a direct and proximate result of Honda's breach of the implied warranty of merchantability, Plaintiff and the other Maryland Class members have been damaged in an amount to be proven at trial, including, but not limited to, benefit-of-the-bargain damages, restitution, and/or diminution of value.

**COUNT XVIII**
**MARYLAND CONSUMER PROTECTION ACT ("MCPA")**
**(MD. CODE, COM. LAW § 13-101, ET SEQ.)**
**On Behalf of the Maryland Class**

424.    Plaintiff Crystal Smith ("Plaintiff" for purposes of this Count) incorporates by reference all preceding allegations as though fully set forth herein.

425.    Plaintiff brings this claim on behalf of the Maryland Class.

426.    Plaintiff is a "consumer" as defined by Md. Code Ann., Com. Law §13-101(c).

427.    Honda is a "merchant" as defined by Md. Code Ann., Com. Law §13-101(g) and "person" as defined by Md. Code Ann., Com. Law §13-101(h).

428.    The Vehicles are consumer goods within the meaning of the MCPA and provided services within the MCPA's meaning of the term consumer services.

429.    The MCPA prohibits the use of any "unfair, abusive, or deceptive trade practices" in the sale or lease of any consumer goods or services. Md. Code Ann., Com. Law §13-301, et seq.

430.    Honda engaged in unfair, abusive, and deceptive practices in violation of the MCPA by willfully failing to disclose and actively concealing the dangerous risk of the Defect in the Vehicles as described above. Honda had an ongoing duty to Plaintiffs and the Maryland Class to refrain from

SECOND AMENDED CLASS ACTION COMPLAINT
- 79 -

unfair, abusive, and/or deceptive practices that violate the MCPA in the course of its business. At a minimum, Honda's acts and practices violate the following sections of the MCPA:

    a.  Making false or misleading statements or other representations of any kind which had the capacity, tendency, or effect of deceiving or misleading consumers;

    b.  Representing that consumer goods or services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have;

    c.  Representing that consumer goods or services are of a particular standard, quality, grade, style, or model which they are not;

    d.  Failing to disclose material facts that deceived and had the tendency to deceive;

    e.  Advertising consumer goods or services: (i) without intent to sell or lease them as advertised or offered; and (ii) with intent not to supply reasonably expected public demand; and

    f.  Engaging in deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with: (i) the promotion or sale of consumer goods or services; or (ii) the subsequent performance of a merchant with respect to an agreement of sale or lease.

431. The Defect constitutes a safety issue that Honda should have disclosed because it was in a superior position to know the true facts related to the Defect, and Plaintiff and members of the Maryland Class could not reasonably be expected to learn or discover the true facts related to this Defect. Honda, by the conduct, statements, and omissions described above, also knowingly and intentionally concealed from Plaintiff and the Maryland Class that the Vehicles suffered from the Defect (and the costs, safety risks, and diminished value of the Vehicles as a result of the Defect).

432. In the course of Honda's business, it willfully failed to disclose and actively concealed the Defect as discussed herein. Honda compounded the deception by repeatedly representing that the Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety, and stood behind its vehicles once they are on the road.

433.   Honda violated the MCPA by concealing, suppressing or omitting material facts regarding the Vehicles' defective rear windshields. This concealed or omitted information is the type of information upon which a consumer would be expected to rely on in making a decision whether to purchase, or how much to pay for, the Vehicles.

434.   Honda concealed, suppressed or omitted these material facts in conducting trade and commerce with the intent that Plaintiff and the Class would rely on the omissions in the purchase or lease of their Vehicles.

435.   To this day, Honda continues to violate the MCPA by actively concealing the material information about the Vehicles and their defective rear windshields and by representing to Plaintiff and members of the Class that the Vehicles are defect-free and safe.

436.   Honda intended that Plaintiff and the Class members would rely on their concealment and omission of material facts, which occurred in the course of conduct involving trade and commerce.

437.   These acts and practices have deceived Plaintiff and are likely to deceive the public. Honda, by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiff and the Maryland Class that the Vehicles suffered from the Defect (and the costs, safety risks, and diminished value of the Vehicles as a result of the Defect) violated the MCPA and caused injuries to Plaintiff and the members of the Maryland Class. The omissions and acts of concealment by Honda pertained to information that was material to Plaintiff and members of the Maryland Class, as it would have been to all reasonable consumers.

438.   As a direct and proximate cause of Honda's violations of the MCPA, Plaintiff and the Class have suffered injury in fact and/or actual damages, in the form of out-of-pocket costs incurred to repair and/or replace their defective rear windshields in the Vehicles. Further, Plaintiff and the Maryland Class members did not receive the benefit of their bargain as a result of Honda's misconduct. Indeed, had Honda disclosed the Defect or had Plaintiff and the Maryland Class members been aware of the Defect in the rear windshield of the Vehicles, Plaintiff and the Maryland Class members either would have paid less for the Vehicles, they would not have purchased the Vehicles, or would have avoided the extensive repair costs associated therewith.

439.     Plaintiff and the Maryland Class members seek all damages permitted by law including monetary relief against Honda in the amount of actual damages, reasonable attorneys' fees, and all other relief available under Md. Code Ann., Com. Law §13-101, et seq.

**COUNT XIX**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**(BASED ON MICHIGAN LAW)**
**On Behalf of the Michigan Class**

440.     Plaintiff Kumar ("Plaintiff" for purposes of this Count) incorporates by reference all preceding allegations as though fully set forth herein.

441.     Plaintiff brings this claim on behalf of the Michigan Class and in the alternative to Count II.

442.     A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Mich. Comp. Laws §§ 440.2314 and 440.2862.

443.     Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under Mich. Comp. Laws §§ 440.2104(1) and 440.2803(3), and a "seller" of motor vehicles under § 440.2103(1)(c).

444.     All Michigan Class members who purchased Vehicles in Michigan are "buyers" within the meaning of Mich. Comp. Laws § 440.2103(1)(a).

445.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2105(1) and 4400.2803(1)(h).

446.     Defendant knew or had reason to know of the specific use for which the Vehicles were purchased. Defendant provided Plaintiff and Michigan Class members with an implied warranty that the Vehicles and any parts thereof were merchantable and fit for the ordinary purposes for which they were sold. This implied warranty included, among other things, a warranty that the Vehicles were manufactured, supplied, distributed, and sold by Defendant, were safe and reliable for providing transportation.

447.     However, the Vehicles did not comply with the implied warranty of merchantability because they were defective and not in merchantable condition, would not pass without objection in

the trade, and were not fit for their ordinary purpose of providing reasonably reliable, safe, and secure transportation at the time of sale or thereafter because, inter alia, the Class Vehicles contained the Defect.

448.   Any attempt by Defendant to disclaim or limit the implied warranty of merchantability for the Vehicles vis-à-vis consumers is unconscionable and unenforceable. Specifically, any warranty limitations are unenforceable because Defendants knowingly sold defective Vehicles without informing consumers about the Defect. Any time limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiff and Michigan Class members. Among other things, Plaintiff and Michigan Class members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and Plaintiff and other Michigan Class members. Additionally, Defendant knew of the Defect at the time of sale.

449.   Furthermore, the circumstances described herein caused Defendant's exclusive or limited remedy to fail its essential purpose such that the Plaintiff and Michigan Class members may seek alternative remedies. Indeed, these breaches of warranties have denied Plaintiff and Michigan Class members the benefit of their respective bargains, which presupposes they were (or are) able to use the Class Vehicles in a safe and reliable manner.

450.   Plaintiff and Michigan Class members have provided Defendant with reasonable notice and opportunity to cure the breaches of their implied warranties by way of the numerous complaints filed against them and the individual notice letters sent by Vehicle owners. Additionally, on June 1, 2023, certain Plaintiffs sent a detailed pre-suit notice letter to Defendant.

451.   Alternatively, Plaintiff and the Michigan Class members were excused from providing Defendants with notice and an opportunity to cure the breach, because it would have been futile. As alleged throughout this Complaint, Defendant has long known that the Vehicles contained the Defect; however, to date, Defendant has not instituted an adequate and meaningful repair program with respect to the Vehicles. As such, Plaintiff and Michigan Class members had no reason to believe that

Defendant would have adequately repaired the Defect if they presented their Vehicles to them for repair.

452.    As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiff's and Michigan Class members' Vehicles were and are defective, and the Defect in their Class Vehicles has not been remedied. Therefore, Plaintiff and Michigan Class members have been damaged, in an amount to be proven at trial.

**COUNT XX**
**MICHIGAN CONSUMER PROTECTION ACT**
**(MICH. COMP. LAWS § 445.901, ET SEQ.)**
**On Behalf of Michigan Class**

**[WITHDRAWN]**

.

**COUNT XXI**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(BASED ON NEW JERSEY LAW)**
**On Behalf of the New Jersey Class**

453.    Plaintiff Kroik ("Plaintiff" for purposes of this Count) incorporates by reference all preceding allegations as though fully set forth herein.

454.    Plaintiff brings this claim on behalf of the New Jersey Class and in the alternative to Count II.

455.    A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to N.J. Stat. Ann. §§ 12A:2-314 and 12A:2A-212.

456.    Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under N.J. Stat. Ann. §§ 12A:2-104(1) and 12A:2A-103(3), and a "seller" of motor vehicles under § 12A:2-103(1)(d).

457.    New Jersey Class members who purchased Vehicles in New Jersey are "buyers" within the meaning of N.J. Stat. Ann. § 12A:2-103(1)(a).

458.    Vehicles are and were at all relevant times "goods" within the meaning of N.J. Stat. Ann. §§ 12A:2-105(1) and 2A-103(1)(h).

459.    Defendant knew or had reason to know of the specific use for which the Vehicles were purchased or leased. Defendant provided Plaintiff and the New Jersey Class members with an implied warranty that the Vehicles and any parts thereof were merchantable and fit for the ordinary purposes for which they were sold. This implied warranty included, among other things, a warranty that the Vehicles were manufactured, supplied, distributed, and sold by Defendant, were safe and reliable for providing transportation.

460.    However, the Vehicles did not comply with the implied warranty of merchantability because they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for their ordinary purpose of providing reasonably reliable, safe, and secure transportation at the time of sale or thereafter because, inter alia, the Vehicles contained the Defect.

461.    Any attempt by Defendant to disclaim or limit the implied warranty of merchantability for their respective New Jersey Class Vehicles vis-à-vis consumers is unconscionable and unenforceable. Specifically, Defendant's warranty limitations are unenforceable because Defendant knowingly sold defective Vehicles without informing consumers about the Defect. Any time limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiff and New Jersey Class members. Among other things, Plaintiff and New Jersey Class members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and Plaintiff and other New Jersey Class members. Additionally, Defendant knew of the Defect at the time of sale.

462.    Furthermore, the circumstances described herein caused Defendant's exclusive or limited remedy to fail its essential purpose such that the Plaintiff and New Jersey Class members may seek alternative remedies. Indeed, these breaches of warranties have denied Plaintiff and New Jersey Class members the benefit of their respective bargains, which presupposes they were (or are) able to use the Class Vehicles in a safe and reliable manner.

463. Plaintiffs and the New Jersey Class Members, have provided Defendant with reasonable notice and opportunity to cure the breaches of their implied warranties by way of the numerous complaints filed against them and the individual notice letters sent by Vehicle owners within a reasonable amount of time after the Defect became public. Additionally, certain Plaintiffs sent a detailed pre-suit notice letter to Defendant on June 1, 2023.

464. Alternatively, Plaintiff and the New Jersey Class members were excused from providing Defendant with notice and an opportunity to cure the breach, because it would have been futile. As alleged throughout this Complaint, Defendant has long known that the Vehicles contained the Defect; however, to date, Defendant has not instituted an adequate and meaningful repair program with respect to the Vehicles. As such, Plaintiff and New Jersey Class members had no reason to believe that Defendant would have adequately repaired the Defect if they presented their Vehicles to Defendant for repair.

465. As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiff's and New Jersey Class members' Vehicles were and are defective, and the Defect in their Vehicles has not been remedied. Therefore, Plaintiff and New Jersey Class members have been damaged, in an amount to be proven at trial.

**COUNT XXII**
**VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT**
**(N.J. STAT. ANN. § 56:8-1, ET SEQ.)**
**On Behalf of the New Jersey Class**

466. Plaintiff Kroik ("Plaintiff" for purposes of this Count) incorporates by reference all preceding allegations as though fully set forth herein.

467. Plaintiff brings this claim on behalf of the New Jersey Class.

468. Defendant, Plaintiff, and New Jersey Class members are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

469. The Vehicles are "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c).

470. The New Jersey Consumer Fraud Act ("New Jersey CFA") prohibits unlawful practices. N.J. Stat. Ann. § 56:8-2.

471. In the course of its business, Defendant, through its agents, employees, and/or subsidiaries, violated the New Jersey CFA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the quality, reliability, and safety of the Vehicles and the Defect, as detailed above.

472. Defendants had an ongoing duty to the Plaintiffs and Class Members to refrain from unfair or deceptive practices under the New Jersey CFA in the course of their business. Specifically, Defendants owed the Plaintiffs and Class Members a duty to disclose all the material facts concerning the Defect in the Vehicles because, as detailed above:

a. Defendant had exclusive access to and far superior knowledge about facts regarding the Defect and Defendant knew these facts were not known to or reasonably discoverable by Plaintiff or New Jersey Class members;

b. Given the Defect's hidden and technical nature, Plaintiff and New Jersey Class members lack the sophisticated expertise in vehicle components that would be necessary to discover the Defect on their own;

c. Defendant knew that the Defect gave rise to safety concerns for the consumers who use the Vehicles, and the Defect would have been a material fact to the New Jersey Class members' decisions to buy Vehicles; and

d. Defendant made incomplete representations about the safety and reliability of the Vehicles while purposefully withholding material facts about a known safety defect. Because Defendant volunteered to provide information about the safety and reliability of Vehicles that it marketed and offered for sale to consumers, Defendant had the duty to disclose the whole truth.

473. As detailed above, the information concerning the Defect was known to Defendant at the time of advertising and selling the Vehicles, all of which was intended to induce consumers to purchase the Vehicles.

474. By misrepresenting the Vehicles as safe and reliable and free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Defect, Defendant engaged

in one or more of the following unfair or deceptive business practices prohibited by N.J. Stat. Ann. § 56:8-2: using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale of the Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

475.    Defendant intended for Plaintiff and New Jersey Class Members to rely on it.

476.    Defendant's unlawful acts or practices, including their misrepresentations, concealments, omissions, and suppressions of material facts, were designed to mislead and had a tendency or capacity to mislead and create a false impression in consumers that the Vehicles were safe and reliable, and that the Vehicles were not affected by the Defect. Indeed, those misrepresentations, concealments, omissions, and suppressions of material facts did in fact deceive reasonable consumers, including the Plaintiff and New Jersey Class Members, about the true safety and reliability of the Vehicles, the quality of the Vehicles, and the true value of the Vehicles.

477.    Defendant's misrepresentations, concealments, omissions, and suppressions of material facts regarding the Defect and true characteristics of the Vehicles were material to the decisions of Plaintiff and New Jersey Class members to purchase those vehicles, as Defendant intended. Plaintiff and New Jersey Class members were exposed to those misrepresentations, concealments, omissions, and suppressions of material facts, and relied on Defendant's misrepresentations that the Vehicles were safe and reliable in deciding to purchase the Vehicles.

478.    Plaintiff's and New Jersey Class members' reliance was reasonable, as they had no way of discerning that Defendant's representations were false and misleading, or otherwise learning that the Vehicles contained the Defect, as alleged above. Plaintiff and New Jersey Class Members did not, and could not, unravel Defendant's deception on their own.

479.    Had Plaintiff and the New Jersey Class members known the truth about the Defect, Plaintiff and the New Jersey Class members would not have purchased the Vehicles, or would have paid significantly less for them.

SECOND AMENDED CLASS ACTION COMPLAINT
- 88 -

480. Plaintiff and New Jersey Class members suffered ascertainable losses and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information.

481. Defendants' violations present a continuing risk to the Plaintiff and New Jersey Class members, as well as to the general public, because the Vehicles remain unsafe due to the Defect. Additionally, their unlawful acts and practices complained of herein affect the public interest.

482. Pursuant to N.J. Stat. Ann. § 56:8-19, Plaintiff and New Jersey Class members seek an order awarding damages and any other just and proper relief available under the New Jersey CFA.

**COUNT XXIII**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(BASED ON OREGON LAW)**
**On Behalf of the Oregon Class**

[WITHDRAWN]

**COUNT XXIV**
**OREGON UNLAWFUL TRADE PRACTICES ACT**
**(OR. REV. STAT. §§ 646.605, ET SEQ.)**
**On Behalf of Oregon Class**

483. Plaintiff Collins ("Plaintiff" for purposes of this Count) incorporates by reference all preceding allegations as though fully set forth herein.

484. Plaintiff brings this claim on behalf of the Oregon Class.

485. Defendant, Plaintiff, and Oregon Class members are "persons" within the meaning of Or. Rev. Stat. § 646.605(4).

486. Defendant is engaged in "trade" and "commerce" within the meaning of Or. Rev. Stat. § 646.605(8).

487. The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits unlawful practice in the course of business. Or. Rev. Stat. § 646.608(1).

488. In the course of its business, Defendant through its agents, employees, and/or subsidiaries, violated the Oregon UTPA by knowingly and intentionally misrepresenting, omitting,

concealing, and/or failing to disclose material facts regarding the quality, reliability, and safety of the Vehicles and the Defect, as detailed above.

489. Defendant had an ongoing duty to Plaintiff and the Oregon Class members to refrain from unfair or deceptive practices under the Oregon UTPA in the course of its business. Specifically, Defendant owed Plaintiff and Oregon Class members a duty to disclose all the material facts concerning the Defect in the Vehicles because, as detailed above:

a. Defendant had exclusive access to and far superior knowledge about facts regarding the Defect and Defendant knew these facts were not known to or reasonably discoverable by Plaintiff or Oregon Class members;

b. Given the Defect's hidden and technical nature, Plaintiff and Oregon Class members lack the sophisticated expertise in vehicle components that would be necessary to discover the Defect on their own;

c. Defendant knew that the Defect gave rise to safety concerns for the consumers who use the Vehicles, and the Defect would have been a material fact to the Oregon Class Members' decisions to buy Vehicles; and

d. Defendant made incomplete representations about the safety and reliability of the Vehicles while purposefully withholding material facts about a known safety defect. Because Defendant volunteered to provide information about the Vehicles' safety and reliability, Defendant had the duty to disclose the whole truth.

490. As detailed above, the information concerning the Defect was known to Defendant at the time of advertising and selling the Vehicles, all of which was intended to induce consumers to purchase the Vehicles.

491. By misrepresenting the Vehicles as safe and reliable and free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Defect, Defendant engaged in one or more of the following unfair or deceptive business practices prohibited by Or. Rev. Stat.§ 646.608(1):

SECOND AMENDED CLASS ACTION COMPLAINT
- 90 -

    a.  Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Vehicles;

    b.  Representing that the Vehicles have approval, characteristics, uses, or benefits that they do not have;

    c.  Representing that the Vehicles are of a particular standard, quality, and grade when they are not; and/or

    d.  Advertising the Class Vehicles with the intent not to sell or lease them as advertised.

Or. Rev. Stat. § 646.608(1)(b), (e), (g), (i).

492. Defendant intended for Plaintiff and Oregon Class members to rely on it to provide adequately designed Vehicles, and to honestly and accurately reveal the safety hazards described above.

493. Defendant's unfair or deceptive acts or practices were designed to mislead and had a tendency or capacity to mislead and create a false impression in consumers that the Vehicles were safe and reliable, and that the Vehicles were not affected by the Defect. Indeed, those misrepresentations, concealments, omissions, and suppressions of material facts did in fact deceive reasonable consumers, including Plaintiff and Oregon Class members, about the true safety and reliability of Vehicles, the quality of the Vehicles, and the true value of the Vehicles.

494. Defendant's misrepresentations, omissions, and concealment of material facts regarding the Defect and true characteristics of the Vehicles were material to the decisions of Plaintiff and Oregon Class members to purchase those Vehicles, as Defendant intended. Plaintiff and Oregon Class members were exposed to those misrepresentations, concealments, omissions, and suppressions of material facts, and relied on Defendant's misrepresentations that the Vehicles were safe and reliable in deciding to purchase Vehicles.

495. Plaintiff's and Oregon Class members' reliance was reasonable, as they had no way of discerning Defendant's representations were false and misleading, or otherwise learning that the Vehicles contained the Defect, as alleged above. Plaintiff and Oregon Class Members did not, and could not, unravel Defendant's' deception on their own.

496.     Had they known the truth about the Defect, Plaintiff and Oregon Class members would not have purchased the Vehicles, or would have paid significantly less for them.

497.     Plaintiff and Oregon Class members suffered ascertainable losses and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information.

498.     Defendant's violations present a continuing risk to Plaintiff and Oregon Class members, as well as to the general public, because the Vehicles remain unsafe due to the Defect. Defendant's unlawful acts and practices complained of herein affect the public interest.

499.     Pursuant to Or. Re. Stat. § 646.638, Plaintiff and Oregon Class members seek an order awarding damages and any other just and proper relief available under the Oregon UTPA.

**COUNT XXV**
**BREACH OF IMPLIED WARRANTY**
**(BASED ON TEXAS LAW)**
**On Behalf of the Texas Class**

500.     Plaintiff Null ("Plaintiff" for purpose of this count) incorporates by reference all preceding allegations as though fully set forth herein.

501.     Plaintiff brings this Count on behalf of the Texas Class and in the alternative to Count II.

502.     Honda was at all relevant times a "merchant" with respect to motor vehicles and "seller" of motor vehicles.

503.     The Vehicles are and were at all relevant times "goods."

504.     A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Tex. Bus. & Com. Code § 2.314.

505.     The Vehicles were defective at the time they left the possession of Honda. The Vehicles were not in merchantable condition and are not fit for the ordinary purpose of providing safe and reliable transportation. Specifically, the Class Vehicles contain a Defect that renders the Vehicles unsafe.

506.     Thus, the Vehicles, when sold and at all times thereafter, were not in merchantable condition or quality and are not fit for their ordinary intended purpose.

507. By virtue of the conduct described herein and throughout this Complaint, Honda breached the implied warranty of merchantability.

508. Plaintiff has afforded Honda a reasonable opportunity to cure the breach by providing Honda a pre-suit notice dated June 1, 2023, but Honda has not remedied the breach.

509. Any attempt by Honda to disclaim or limit the implied warranty of merchantability vis-à-vis consumers would be unconscionable and unenforceable because Honda knowingly sold a defective product without informing consumers about the Defect. Any time limits contained in Honda's warranty periods would also be unconscionable and inadequate to protect Plaintiff and the other Texas Class members. Among other things, Plaintiff and the other Texas Class members had no meaningful choice in determining any time limitations, the terms of which unreasonably favored Honda. A gross disparity in bargaining power existed between Honda and Plaintiff and the other Texas Class members, and Honda knew of the defect at the time of sale.

510. As a direct and proximate result of Honda's breach of the implied warranty of merchantability, Plaintiff and the other Texas Class members have been damaged in an amount to be proven at trial, including, but not limited to, benefit-of-the-bargain damages, restitution, and/or diminution of value.

**COUNT XXVI**
**VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT**
**(TEX. BUS. & COM. CODE §§ 17.41, ET SEQ.)**
**On Behalf of the Texas Class**

511. Plaintiffs Null and Gross ("Plaintiffs" for purposes of this count) incorporate by reference all preceding allegations as though fully set forth herein.

512. Plaintiffs bring this Count on behalf of the Texas Class.

513. Plaintiffs and Defendant are each "persons" as defined by Tex. Bus. & Com. Code § 17.45(3). The Vehicles are "goods" under Tex. Bus. & Com. Code § 17.45(1). Plaintiffs and the other Texas Class members are "consumers" as defined in Tex. Bus.& Com. Code § 17.45(4). Defendant has at all relevant times engaged in "trade" and "commerce" as defined in Tex. Bus. & Com. Code § 17.45(6), by advertising, offering for sale, selling, leasing, and/or distributing the Vehicles in Texas, directly or indirectly affecting Texas citizens through that trade and commerce.

514.     The allegations set forth herein constitute false, misleading, or deceptive trade acts or practices in violation of Texas's Deceptive Trade Practices-Consumer Protection Act ("DTPA"), Tex. Bus. & Com. Code §§ 17.41, et seq.

515.     By failing to disclose and actively concealing the Defect in the Vehicles' rear hatch window, Defendant engaged in deceptive business practices prohibited by the DTPA, including engaging in acts or practices which are unfair, misleading, false, or deceptive to the consumer.

516.     Defendant knew that the rear hatch windows in the Vehicles were defective, would fail without warning, and were not suitable for their intended use. Defendant nevertheless failed to warn Plaintiffs and the other Texas Class members about the Defect despite having a duty to do so.

517.     Defendant owed Plaintiffs and the other Texas Class members a duty to disclose the defective nature of the rear hatch window in the Vehicles, because Defendant:

    a.  Possessed exclusive knowledge of the Defect rendering the Vehicles more dangerous and unreliable than similar vehicles;

    b.  Intentionally concealed the Defect associated with the rear hatch window; and/or

    c.  Made incomplete representations about the characteristics and performance of the Vehicles generally, while purposefully withholding material facts from Plaintiffs and the other Texas Class members that contradicted these representations.

518.     Defendant's conduct as alleged above constitutes unfair or deceptive acts or practices in violation of the DTPA for, inter alia, one or more of the following reasons:

    a.  representing that the Vehicles have sponsorship, approval, characteristics, benefits, and qualities that they do not have;

    b.  representing that the Vehicles are of a particular standard, quality, or grade when they are not;

    c.  advertising the Vehicles with intent not to sell them as advertised including but not limited to selling the Vehicles with the known Defect at issue in this litigation; and

    d.  knowingly making false and misleading statements of fact concerning selling the Vehicles with the known Defect at issue in this litigation.

519.    Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true performance and characteristics of the Vehicles. Defendant's intentional concealment of and failure to disclose the defective nature of the Vehicles to Plaintiffs and the other Texas Class members constitutes an "unconscionable action or course of action" under Tex. Bus. & Com. Code § 17.45(5) because, to the detriment of Plaintiffs and the other Texas Class members, that conduct took advantage of their lack of knowledge, ability, and experience to a grossly unfair degree. That "unconscionable action or course of action" was a producing cause of the economic damages sustained by Plaintiffs and the other Texas Class members.

520.    Defendant is also liable under Tex. Bus. & Com. Code § 17.50(a) because Defendant's breach of the implied warranty of merchantability set forth herein was a producing cause of economic damages sustained by Plaintiffs and the other Texas Class member

521.    As a result of its violations of the DTPA detailed above, Defendant caused actual damage to Plaintiffs and, if not stopped, will continue to harm Plaintiffs. Plaintiffs currently own a Class Vehicle that is defective. The Defect associated with the Vehicles' rear hatch window has caused the value of the Vehicles to decrease.

522.    All procedural prerequisites, including notice, have been met because Plaintiffs sent notice of the Defect to Defendant on or about June 1, 2023 (Exhibit E). Regardless, providing notice to Defendant is rendered impracticable pursuant to Tex. Bus. & Com. Code § 17.505(b) and unnecessary because Defendant has notice of the claims against it through the numerous complaints filed against it and also because of its own employees' experiences with the Defect at the manufacturing facility in East Liberty, Ohio where the Vehicles were made. Pursuant to Tex. Bus. & Com. Code § 17.505(b), Plaintiffs, individually and on behalf of the other Texas Class members, will send to the Texas Consumer Protection Division a copy of this Complaint.

523.    Plaintiffs and the other Texas Class members sustained damages as a result of the Defendant's unlawful acts and are, therefore, entitled to damages and other relief as provided under the DTPA.

**COUNT XXVII**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(BASED ON WASHINGTON LAW)**

**On Behalf of the Washington Class**

[WITHDRAWN]

**COUNT XXVIII**
**VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT**
**(WASH. REV. CODE ANN. §§ 19.86.010, ET SEQ.)**
**On Behalf of the Washington Class**

524.    Plaintiff Bland ("Plaintiff" for purposes of this count) incorporates by reference all preceding allegations as though fully set forth herein.

525.    Plaintiff brings this Count on behalf of the Washington Class.

526.    The Washington Consumer Protection Act provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Wash. Rev. Code Ann. § 19.86.020.

527.    Defendant is a "person" under Wash. Rev. Code Ann. § 19.86.010(1).

528.    The transactions between Plaintiff and the other Washington Class members on one hand and Defendant on the other, leading to the purchase of the Vehicles by Plaintiff and the other Washington Class members, constitute "trade" and "commerce" as defined by Wash. Rev. Code Ann. § 19.86.010(2).

529.    In the course of Defendant's business, Defendant willfully misrepresented and failed to disclose and actively concealed the dangerous risk posed by the Defect in the Vehicles. Particularly in light of the representations in its national advertising campaign touting the safety and reliability of the Vehicles, a reasonable American consumer would expect the Vehicles to operate without known safety hazards. Further, a reasonable American consumer would expect that the rear hatch window in the Vehicles would function appropriately and would not contain a defect causing the windows to spontaneously explode. Accordingly, Defendant engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices.

530.    Defendant's acts as described throughout this Amended Complaint had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation,

SECOND AMENDED CLASS ACTION COMPLAINT
- 96 -

or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith. Accordingly, Defendant engaged in acts and practices violating Wash. Rev. Code Ann. § 19.86.020, including engaging in conduct likely to deceive.

531. In purchasing the Vehicles, Plaintiff and the other Washington Class members were deceived by Defendant's failure to disclose that the rear hatch windows in the Vehicles were defective and would fail without warning.

532. Plaintiff and Class members reasonably relied upon Defendant's misrepresentations and material omissions and Plaintiff and Class members did not, and could not, unravel Defendant's deception on their own. Plaintiff and other Washington Class members were not aware of this Defect prior to purchase.

533. The conduct of Defendant as set forth herein constitutes unfair or deceptive acts or practices. Defendant knew about the Defect prior to the sale of the Class Vehicles but did not disclose the existence of the Defect to Plaintiff and the Washington Class members and concealed the Defect. Defendant also omitted information regarding the safety and reliability of the Class Vehicles.

534. Defendant's actions as set forth above occurred in the conduct of trade or commerce.

535. Defendant's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

536. Defendant intentionally and knowingly misrepresented material facts regarding the Vehicles with intent to mislead Plaintiff and the Class.

537. Defendant knew or should have known that its conduct violated this statute.

538. Defendant owed Plaintiff and the Washington Class a duty to disclose the truth regarding the Defect because the Defect affects the safety of the Vehicles and/or because Defendant: possessed superior/exclusive knowledge of the design of the Vehicles; made incomplete representations regarding the safety and durability of the Vehicles, while purposefully withholding material facts from Plaintiff and the Class that contradicted these representations; and/or intentionally concealed the Defect from Plaintiff and the Washington Class.

539.    Defendant's actions constituted a generalized course of deception that impacts the public interest because Plaintiff and the Washington Class members were injured in exactly the same way as many others purchasing these Vehicles. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendant's business and has the potential for repetition.

540.    Honda's actions as set forth above induced Plaintiff and the Washington Class members to purchase their Vehicles from Defendant or its agents and/or pay a higher price for their Class Vehicles than they otherwise would have.

541.    Plaintiff and the Washington Class members were injured as a result of Defendant's conduct. Due to Defendant's deceptive or unfair conduct, Plaintiff and the Washington Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain. Their Vehicles have also suffered a diminution in value. Further, Plaintiff and the Washington Class members experienced out-of-pocket losses and expenses because of the Defect and Defendant's conduct.

542.    Defendant's conduct proximately caused the injuries to Plaintiff and the Washington Class members.

543.    Defendant is liable to Plaintiff and the Washington Class members for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages.

**COUNT XXIX**
**BREACH OF IMPLIED WARRANTY**
**(BASED ON PENNSYLVANIA LAW)**
**On Behalf of the Pennsylvania Class**

544.    Plaintiff Perrins ("Plaintiff" for purpose of this count) incorporates by reference all preceding allegations as though fully set forth herein.

545.    Plaintiff brings this Count on behalf of the Pennsylvania Class and in the alternative to Count II.

546.    Honda was at all relevant times a "merchant" with respect to motor vehicles and "seller" of motor vehicles.

547.    The Vehicles are and were at all relevant times "goods."

548.    A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Pa. U.C.C.§ 2314.

549.    The Vehicles were defective at the time they left the possession of Honda. The Vehicles were not in merchantable condition and are not fit for the ordinary purpose of providing safe and reliable transportation. Specifically, the Class Vehicles contain a Defect that renders the Vehicles unsafe.

550.    Thus, the Vehicles, when sold and at all times thereafter, were not in merchantable condition or quality and are not fit for their ordinary intended purpose.

551.    By virtue of the conduct described herein and throughout this Complaint, Honda breached the implied warranty of merchantability.

552.    Plaintiff and Pennsylvania Class members have provided Defendant with reasonable notice and opportunity to cure the breaches of their implied warranties by way of the numerous complaints filed against them and the individual notice letters sent by Vehicle owners. Additionally, on June 1, 2023, certain Plaintiffs sent a detailed pre-suit notice letter to Defendant.

553.    Any attempt by Honda to disclaim or limit the implied warranty of merchantability vis-à-vis consumers would be unconscionable and unenforceable because Honda knowingly sold a defective product without informing consumers about the Defect. Any time limits contained in Honda's warranty periods would also be unconscionable and inadequate to protect Plaintiff and the other Pennsylvania Class members. Among other things, Plaintiff and the other Pennsylvania Class members had no meaningful choice in determining any time limitations, the terms of which unreasonably favored Honda. A gross disparity in bargaining power existed between Honda and Plaintiff and the other Pennsylvania Class members, and Honda knew of the defect at the time of sale.

554.    As a direct and proximate result of Honda's breach of the implied warranty of merchantability, Plaintiff and the other Pennsylvania Class members have been damaged in an amount to be proven at trial, including, but not limited to, benefit-of-the-bargain damages, restitution, and/or diminution of value.

**COUNT XXX**
**VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW**

**(73 P.S. § 201-1, ET SEQ.)**

**On Behalf of the Pennsylvania Class**

555.   Plaintiff Perrins ("Plaintiff" for purposes of this count) incorporates by reference all preceding allegations as though fully set forth herein.

556.   Plaintiff brings this Count on behalf of the Pennsylvania Class.

557.   Honda's business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts or practices under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, et seq. ("PUTPCPL").

558.   At all relevant times, Plaintiff and all members of the Pennsylvania Class were "consumers" within the meaning of the PUTPCPL, 73 P.S. § 201-1.

559.   Honda's conduct, as set forth herein, occurred in the conduct of a sale within the meaning of the PUTPCPL, 73 P.S. § 201-1.

560.   The practices of Honda, described above, violate the PUTPCPL for, inter alia, one or more of the following reasons:

    a.   Honda engaged in unconscionable commercial practices in failing to reveal material facts and information about the Vehicles, which did, or tended to, mislead Plaintiff and the Pennsylvania Class members about facts that could not reasonably be known by the consumer;

    b.   Honda failed to reveal facts that were material to the transactions in light of representations of fact made in a positive manner;

    c.   Honda caused Plaintiff and the Pennsylvania Class members to suffer a probability of confusion and a misunderstanding of legal rights, obligations and/or remedies by and through its conduct;

    d.   Honda failed to reveal material facts to Plaintiff and the Pennsylvania Class members with the intent that Plaintiff and the Pennsylvania Class members rely upon the omission;

    e.   Honda made material representations and statements of fact to Plaintiff and the Pennsylvania Class that resulted in Plaintiff and the Pennsylvania Class members

reasonably believing the represented or suggested state of affairs to be other than what they actually were;

f. Honda intended that Plaintiff and the other members of the Pennsylvania Class rely on its and omissions, so that Plaintiff and other Pennsylvania Class members would purchase the Vehicles; and

g. Under all of the circumstances, Honda's conduct in employing these unfair and deceptive trade practices was malicious, willful, wanton and outrageous such as to shock the conscience of the community and warrant the imposition of punitive damages.

561. Honda's actions impact the public interest because Plaintiff and members of the Pennsylvania Class were injured in exactly the same way as thousands of others purchasing the Vehicles as a result of and pursuant to Honda's generalized course of deception.

562. Had Plaintiff and other members of the Pennsylvania Class known of the defective nature of the Vehicles, they would not have purchased the Vehicles or would have paid less for their them.

563. The foregoing acts, omissions and practices proximately caused Plaintiff and other members of the Pennsylvania Class to suffer an ascertainable loss and actual damages in the form of, inter alia, overpaying for their Vehicles that have suffered a diminution in value.

564. Honda knew that the rear hatch windows in the Vehicles were defective, would fail without warning, and were not suitable for their intended use. Honda nevertheless failed to warn Plaintiff and the other Pennsylvania Class members about the Defect despite having a duty to do so. Honda violated the PUTPCPL by concealing and failing to disclose the Defect.

565. Honda had an ongoing duty to Plaintiff and the Pennsylvania Class to refrain from unfair and deceptive practices under the PUTPCPL in the course of its business.

566. Plaintiff and the Pennsylvania Class suffered ascertainable loss and actual damages as a direct and proximate result of Honda's concealments, misrepresentations, and/or failure to disclose material information.

567.   Defendant is liable to Plaintiff and Pennsylvania Class members for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, and any other just and proper relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class members, respectfully request judgment against Defendant as follows:

(A)   certifying the proposed Nationwide Class and state specific classes;

(B)   appointing Plaintiffs and their counsel to represent the Classes;

(C)   alternatively, appointing Plaintiffs McIntyre, Regnier, Bocek, Nienhueser, Smith, Kumar, Kroik, Collins, Null, Gross, Bland and Perrins, and their counsel to represent the Alabama, California, Illinois, Kansas, Maryland, Michigan, New Jersey, Oregon, Pennsylvania, Texas, and Washington Classes, respectively;

(D)   awarding compensatory, punitive, exemplary, and other recoverable damages;

(E)   awarding reasonable attorneys' fees and expenses;

(F)   awarding pre-judgment and post-judgment interest; and

(G)   awarding such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

Dated: August 12, 2024                    Respectfully submitted,

                                          */s/ Jeffrey S. Goldenberg*

                                          Jeffrey S. Goldenberg (admitted pro hac vice)
                                          **GOLDENBERG SCHNEIDER, L.P.A.**
                                          4445 Lake Forest Drive, Suite 490
                                          Cincinnati, Ohio 45242
                                          jgoldenberg@gs-legal.com
                                          (513) 345-8297
                                          jgoldenberg@gs-legal.com

Annick M. Persinger (CA Bar No. 272996)
**TYCKO & ZAVAREEI LLP**
10880 Wilshire Blvd. Suite 1101
Los Angeles, CA 90024
(510) 254-6808
*apersinger@tzlegal.com*

Andrea R. Gold (admitted pro hac vice)
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Avenue, NW Suite 1010
Washington, DC 20006
(202) 973-0900
*agold@tzlegal.com*
*lfriedman@tzlegal.com*

Frank Bartela (admitted pro hac vice)
**DWORKEN & BERNSTEIN**
60 South Park Place
Painesville, OH 44077
(440) 352-3391
*fbartela@dworkenlaw.com*

Joseph Lyon (pro hac vice forthcoming)
**THE LYON FIRM**
2754 Erie Avenue
Cincinnati, OH 45208
(513) 381-2333
*jlyon@thelyonfirm.com*

*Counsel for Plaintiffs*